· JOHN CUNNINGHAM *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 16, 1902.*

1. CRIMINAL LAW—*when remark by judge is ground for reversal.* A remark by the judge before the jury in a criminal case is ground for reversal, if, considered as a statement, it indicates to the jury the belief of the judge upon a material fact prejudicial to the defense, or if, considered as a question, it is so leading and suggestive that had it been propounded by counsel for the People it would have been error to overrule an objection thereto.

2. SAME—*prejudicial remarks.* Where counsel for the defendants in a murder trial is trying to frame an hypothetical question, under the evidence, as to how the bruises found upon the head of the deceased were produced, it is error for the court to ask, before the jury, "Why don't you say the bruise was caused by a blow from a fist?" and again, later, "Hadn't you better add to that, that the bruise was produced by a blow of a fist and that he was choked?"

3. SAME—*what questions are for the jury in a murder trial.* If the evidence tends to show that the victim of the assault was in feeble health; that his heart and other vital organs were diseased; that the bruises on his head were slight; that his skull was not fractured; that after being struck by his assailant he fell to the pavement; that he got up and walked a few steps and fell again, it is for the jury to say, from the evidence, what caused the bruises, and whether death resulted from them or from the fall or from his diseased condition.

4. SAME—*when it is error for the court to grant a nolle prosequi during trial.* Where the defendants on trial for murder claim, and the evidence tends to show, that the two persons jointly indicted with them, but not apprehended, were the guilty parties, it is prejudicial error for the court, during the closing argument for the People, to grant the State's attorney's motion to enter a *nolle prosequi* as to such parties, made with the remark that there was nothing in the defendant's contention that any one else than themselves committed the assault.

5. SAME—*rule as to assaults upon persons in feeble condition.* If one who is enfeebled by disease is unlawfully assaulted, and an injury is inflicted upon him which is mortal to him in his enfeebled condition although it would not have been mortal to a man in good health, his assailant is deemed, in law, to be guilty of murder or manslaughter, as the case may be, notwithstanding he did not know of his victim's physical condition.

6. SAME—*when blow is regarded as the cause of death—when not.*  If a blow so affects a person that he is unable to stand, and in consequence thereof falls to the pavement and death results from the fall, the blow is regarded as the cause of death; but if the inability to stand arises wholly from one or more of the deceased's physical infirmities or from intoxication, and such inability to stand was not contributed to by the blow, then his death should be attributed to natural causes.

7. SAME—*age of prisoner at time sentence is passed controls place of confinement.*  It is the age of the offender at the time it becomes necessary to determine the place of his detention which governs as to his being sentenced to the penitentiary or the reformatory, and not his age when the crime was committed.

8. SAME—*when it is error to give instructions as to rule of principals and accessories.*  It is error to give instructions as to the rule relating to principals and accessories where the record is barren of any evidence upon which to base the same.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JESSE HOLDOM, Judge, presiding.

A. J. HANLON, and JOHN PFEIFFER, for plaintiffs in error.

H. J. HAMLIN, Attorney General, (CHARLES S. DENEEN, State's Attorney, and HARRY OLSON, of counsel,) for the People.

Mr. JUSTICE BOGGS delivered the opinion of the court:

An indictment was returned into the criminal court of Cook county, charging the plaintiffs in error, John Cunningham and John Callahan, and two other persons, namely, Harry A. Taylor and Patrick Kane, with the crime of murder in the killing of one Peter Hartman. Taylor and Kane were not apprehended, but the plaintiffs in error were placed on trial before the court and a jury in said criminal court, and were adjudged guilty of the crime of manslaughter, and condemned to be imprisoned in the State penitentiary at Joliet for an indefinite period.  They allege that errors which greatly prejudiced

their cause before the jury intervened in the hearing of the cause, and have sued out this writ of error to bring the record of their conviction into review in this court.

The indictment contained five counts, each charging the said plaintiffs in error and said Taylor and Kane with the murder of said Peter Hartman. The State's attorney, however, elected to proceed to trial on the first and fifth counts only. The first count charged the said four parties accomplished the death of said Hartman by "striking, beating, pushing and shoving him" with their "fists." The fifth count charged said indicted parties made an assault upon said Hartman "in some way and manner and by some means, instruments and weapons to the grand jurors unknown," and killed and murdered him.

The testimony of Hattie Reed and Daisy Drummond was relied upon by the People to show the circumstances of the killing of Hartman, and that of Hattie Reed alone to identify the plaintiffs in error as the parties who took his life. Her ability to know they were the persons who assaulted Hartman, and, in brief, the reliability and value of her identification of the plaintiffs in error as the guilty parties, became of the utmost importance in the investigation before the jury. In the view we have taken of the case the cause must be again submitted to a jury for trial, and for that reason we shall refrain from commenting upon the testimony, except so far as it may be necessary in passing upon the matters assigned as for error, and nothing here said is intended to reflect the views of this court as to any matter of fact herein involved.

Hattie Reed, a colored woman, testified, in substance, that on Sunday, the 16th day of September, 1900, between the hours of twelve o'clock, noon, and one o'clock P. M., she was employed as a chambermaid in the Kensington Hotel, in the city of Chicago, and was engaged in "cleaning up" one of the rear rooms on the fourth floor of the building, known as room No. 48; that there were two windows in the room, both opening upon the alley which

leads north from Harrison to VanBuren street, in the
block bounded on the east by State street, on the west
by Dearborn street, on the south by Harrison street and
on the north by VanBuren street; that immediately ad-
joining room No. 48 on the north there was another room
of the hotel which also had a window opening on the
alley, from which latter window an iron fire-escape led
down into the alley; that while the witness was so en-
gaged she testified she heard some one down in the alley
cry "help," and she looked from the north window in
room No. 48, through the fire-escape, into the alley, and
saw three persons on the west side of the alley some fifty
feet to the north of her position. She then had no ac-
quaintance with or had ever seen either of the plaintiffs
in error. Her statements as to what she saw are ab-
stracted as follows: "When I looked out of the window
I saw three men. One was sitting against a barrel in the
corner, one was sitting on the ground and had the old
man down between his knees, and the other fellow had
his hands around the old man's neck and was choking
him. The two men I see here in court. This one (indi-
cating Callahan) had the old man between his knees. He
kept his hands around the old man's neck, and this one
at the chair was going into the old man's pockets. He
took something out of his pocket and put it in his own
pocket, but I didn't know what it was. The old man
raised up his hands like this, and this man (indicating
Cunningham) struck him once beside the head with his
fist. After he put his hand in the old man's pocket they
ran down the alley, south. Then the old man got up and
started to walk, and he staggered and fell in the middle
of the alley. I stayed there until after the patrol wagon
came. A crowd gathered, and before the wagon came
some men picked him up and sat him against a barn door.
The old man had on tan shoes, light overcoat and light
hat. Cunningham had on a blue suit, and the other one
had on light pants and black coat. When I saw Calla-

han at the station he had on a dark suit. The man I
saw in the alley had on a light suit. The old man's head
was to the north when he fell. When they had his head
between the man's knees he was facing north, towards
VanBuren street, his back to me. They were there five
minutes after I went to the window. Callahan was look-
ing north and kept that position all the time. He was a
settled man, the man I call the old man. I don't know
about how old he was. I don't remember whether his
hair was gray or not. He had a beard. I don't know
what color. I saw his face when he got up. I had a good
view of it. There was no blood upon his face. When he
first got up he started towards VanBuren street. I don't
know how far he walked before he fell in the middle of
the alley. He fell forward on his face. He remained on
his face while I was there. Nobody turned him over. I
don't know how long he lay there before they picked him
up and set him against the wall. I could not recognize
the persons who picked him up. I didn't see whether the
old man had a mustache or not. I only saw one blow
struck with the fist. All the time I saw the men scuffling
in the alley the other two men had their hats on."

As before stated, the rear of the Kensington Hotel was
provided with an iron fire-escape. It reached the fourth
floor at a window immediately north of that through
which the witness Hattie Reed was looking when she
saw the occurrences in the alley fifty feet to the north
of her position and across the alley. The fire-escape was
composed of iron rods and supplied with an iron plat-
form at the window. The floor of the platform was not
solid, but there were small holes through it. The plat-
form extended to within six or eight inches of the north
side of the window at which the witness Hattie Reed
stood, and at the same level as the bottom of the window.
As to the obstruction to her view caused by this fire-
escape the witness stated: "There is a fire-escape just
north of the middle window, between me and the point

I was looking toward at the time. I was looking to the right—north. I was looking through the fire-escape. The fire-escape extends from the top floor of the building to the first floor above the ground. The three men were on the west side of the alley, about fifty feet north of my window." As further bearing upon her ability to recognize the plaintiffs in error she further testified: "About a half an hour after the patrol wagon took the body of the old man away the same two boys came back into the alley again and were inquiring what had taken place. They were pretty close to the man they spoke to, and just asked, 'What had occurred?' They were standing right under my window. They didn't speak very loud when they asked the man the question. I was on the fourth floor of the building. I heard what they said. They were right under my window all the time. I saw their faces. They heard me talking and looked up. I was talking to Daisy Drummond. She was looking out of the window under mine when the two men came back, and I was talking to her at the time. She was on the first floor of the hotel. I said to Daisy, 'There are the same two men, and if I saw an officer I would tell him to take them.'"

Daisy Drummond denied the conversation detailed by the colored woman, Hattie Reed, occurred between them. As to this she testified: "I did not talk with the colored woman, (Hattie Reed.) I did not know she was there. She did not say to me, 'There are the same two men; if I saw a policeman I would have them arrested.'" Daisy Drummond further testified: "I was living at the Kensington Hotel, 302 and 304 State street, September 16 last. I saw two boys or men. When I went to the window they were holding a man between them some way. The old man was sitting down in a doorway, and the shorter of the two boys, I think, was holding his head. The other was kind of kneeling over him, and the one that was kneeling over him, I don't know, he made a motion

as if to take something from the man's pockets and he put it in his own, and they were in that position just a few moments or so, and the one kneeling over him struck him and they both ran down the alley. He struck him with his fist, as I saw. They went towards Harrison street, south. I was in my room at the time, looking out of the window. My room was on the second floor. I saw the Reed woman afterwards, yes, sir. I was in room 32 of the Kensington Hotel, 302 State street. I was south in the alley from this. It happened across the alley,—north, opposite side. I don't know how far. It was further than across this room. After they left the old man he sat a moment, then got up on his feet, and he kind of put his hand up as if going to fall. He put his hands up and fell down on his head, to the north. He fell out from the doorway in the alley. His face was on the pavement. He lay on his face. It looked to me like a blow of the fist, just like you would strike a person. That was all I saw. When he was first struck he didn't get right up for a moment. He sat there in the position he was sitting in when they ran away. He fell on his face. The alley is paved. I saw the paving stones. He seemed to fall very hard. I left the window. When I came back some men had put him up in the doorway. He had taken a few steps out of the doorway where I first saw him, when he fell. I didn't notice how he was dressed. One of the other men had on light or gray pants, dark coat, and the other was entirely in black. I would not be able to identify the men. I think they came back up the alley and stood there. Of course, I am not sure they were the same ones. I thought they were, on account of being dressed alike. They were dressed so near like the other men I thought they were the same ones. I could not see their faces because I was up over them. The men came back before the police came, and the police came five minutes after it happened. They returned within five minutes after it happened."

The plaintiffs in error each testified and were fully cross-examined. In substance, their testimony was that they were in the alley in question on the day of the death of Hartman. They testified they were drinking beer out of a can, and were in the rear of Nos. 310 and 312 State street, at a point about one hundred feet or more south of the point in the alley where Hartman was assaulted, as testified to by the witnesses for the People, Reed and Drummond, and that they saw Harry A. Taylor (the same Taylor who is charged in the indictment with the murder of Hartman) in the alley with a drunken man; that when said Taylor and the intoxicated man were in the rear of 298 State street, (a saloon,) they saw Patrick Kane (also indicted in the same indictment) come out into the alley from the rear of another saloon, and Kane and Taylor seemed to "scuffle or wrestle around" with the drunken man; that they heard the cry for help and started north up the alley toward the scene of the affray, and that, fearing they would be arrested for "canning beer" in the alley, they turned about to the south and went into the rear of a saloon at 316 State street and afterward went riding on the lake in a boat. They testified that while in the alley, and before the drunken man cried for help, some one threw some water from a window and it fell upon them, and that Callahan angrily inquired who had thrown out the water; that one William Hackett appeared at the open window, and Cunningham recognized him and asked him to come down and have a drink with them. They both denied that they assaulted the man, Hartman, or had any connection with the assault made upon him.

Plaintiffs in error were corroborated by the testimony of said William Hackett, a witness produced in their behalf. He testified, in substance, as follows: "Last September 16 I was living at the Royal rooming house, 308 State street. I was there that day between twelve and one o'clock. It fronts on State street and runs west to

the alley. It is in the same block with the Trocadero Theater, and those saloons 296 and 298, and other saloons. On September 16 last I was in the wash-room of the rooming house. The wash-room is in the rear, on the first floor, on this alley. I was taking a wash and heard loud talking in the alley. I looked out and saw some parties and Cunningham and Callahan. I threw a cup of water out on this John Cunningham,—the same one who sits right over there. I threw a cup of water on this young man, and one of them made the remark, 'Who do you suppose that son of a bitch is?' I stepped back for half a minute and then looked out. They looked up and recognized me and asked me to come down and have a drink with them. They were drinking beer. This was between twelve and one o'clock. I washed myself, and while I was shining my shoes,—there's a window sill there about two feet high, right to the rear,—I heard some one holler 'help.' I heard it the second time. All I had to do was to bend over and look out in this alley. I looked up the alley, I judge some two hundred feet. I saw what I supposed was a fight from the distance, on the west side of the alley, about, I judge, two hundred feet north of me. It lasted a minute or so and I saw two people disappear from there. I saw a crowd gather. I finished my shoes and went out the front way to VanBuren street, and as I got to the alley some one said, 'There's a man dead.' I went up the alley and saw the dead man. As I looked out of the window and saw the fight up the alley, Cunningham and Callahan were about forty or fifty feet from me. When they saw the fight they started down that way. As I looked out I saw them, but my attention was called further up the alley. Cunningham and Callahan were under the window where I was, about forty or fifty feet away from me, at the time the fight was going on. One of the parties down the alley in the fight,—one of those who disappeared,—had on a light coat,—it looked like an overcoat,—and the other was dressed in dark.

Both of the men were larger than these men here—bigger than I am. They disappeared across the alley, on the east side. I could see right down the alley, and it lasted no time after I heard the second holler, and these men disappeared from this man that got killed. I saw the body lying there afterwards at the same place where I saw the fight. I just took a look at him and walked away. The window was open and I was shining my shoes there. I saw Cunningham and Callahan have a can there. They were drinking. It was two or three minutes from the time that I threw the water out of the window until I heard the first cry for help. Cunningham and Callahan used to come to the saloon when I tended bar. I didn't know Callahan's last name, and only knew Cunningham as 'John.' That is Cunningham, and this is Callahan here, as I understand. I was not on speaking terms with them. It was two or three years this winter that I first saw them. As I looked up the alley I supposed it was a fight. There were three people in the fight. They disappeared from the man and started across the alley. At the time of the trouble these two men, (indicating,) Cunningham and Callahan, were under the window, and they started towards this trouble after the hollering. I don't know whether they got there or not."

It will be observed the circumstances of the assault upon Hartman, and that it was participated in by but two persons, are detailed with substantial accord by the witnesses for the People, Hattie Reed and Daisy Drummond, and by the plaintiffs in error and the witness in their behalf, William Hackett. Neither of the witnesses for the People, Hattie Reed or Daisy Drummond, was acquainted with the plaintiffs in error, or either of them. Daisy Drummond at no time assumed to identify either of the plaintiffs in error as being the parties she saw engaged in the affray or scuffle in the alley, but testified she could not identify the plaintiffs in error as being the parties. The identification of the plaintiffs in error as

being the assailants of Hartman rested wholly upon the testimony of the colored woman, Hattie Reed. It was absolutely inconsistent with the testimony of the witness William Hackett and also with that of the plaintiffs in error. She testified she had no acquaintance with either of the plaintiffs in error, and had, so far as she knew, never seen them, or either of them, prior to the day she saw the occurrences in the alley to which she testified. Her point of view at that time was from a window four stories above the alley when the deceased and those who assaulted him were engaged in the affray. She was looking down upon them through the fire-escape. She testified the person she identified as Callahan was looking to the north and kept in that position all the time. She was looking from the south, and consequently had no view of his face. The person whom she identified as the deceased she called an old man and said he wore a beard, but she could not say whether he had a mustache or not. He was thirty-one years of age and was smooth shaven, save a mustache. She testified the "old man," as she denominated the deceased, had on a light overcoat. The driver of the patrol wagon who removed the body testified he had a sack coat and no overcoat. The plaintiff in error Cunningham testified that it was Patrick Kane who had on the light overcoat. The witness Hattie Reed testified the two men she saw assault Hartman came again into the alley nearer to the window from which she was looking; that she saw them and recognized them, and called the attention of the witness Daisy Drummond to them, and said to Miss Drummond, "There are the same two men, and if I saw a policeman I would tell him to take them." Daisy Drummond denied that any such conversation occurred, and testified that she saw the same two men in the alley a second time, but would not identify the plaintiffs in error as being the parties, though she was in a lower story of the hotel than was Hattie Reed, and certainly nearer to

the parties in the alley. It was proven that at the inquest held over the body of the deceased, Hartman, on Monday following the day of his death, a photograph of Harry A. Taylor, the person who stood indicted for the murder of Hartman in the same indictment with plaintiffs in error, was shown to said Hattie Reed while she was testifying as a witness before the coroner and a jury, and that she testified it was a picture of one of the two men she saw engaged in the affray or scuffle with Hartman in the alley. As to that incident, said Hattie Reed testified at the trial in the criminal court, as follows: "Yes, at the inquest I was shown this photograph, (a photograph of Taylor which counsel had handed to the witness,) and I said it looked like a picture of the man that was on top of the old man, and I now say it looks like the picture of the man I saw on top of the old man."

The plaintiffs in error testified, in substance, that on Monday morning after the occurrences in the alley on Sunday they were brought out from their cells to be shown to the witness Hattie Reed and other witnesses, to see if such witnesses could identify them; that they stood in the presence of said Hattie Reed and the other persons (one a Mr. Wilson) for some time, and that neither Hattie Reed nor any of the witnesses said or did anything tending to identify them; that finally some one said, "Turn them around," and that Inspector Hartnett said, "What the hell kind of identification is this? Take them out," and that they were taken out, but were subsequently returned and again presented to Hattie Reed for identification. Inspector Hartnett was produced in rebuttal as a witness for the People, and his testimony upon the point was as follows:

Q. "Did you shove the two men out of the room and say, 'What the hell kind of identification is this?'

A. "I did not shove them out.

The court: "Did you say that?

A. "I said this; I will explain myself.

Mr. Olson: "You can explain afterwards.

Q. "Did you or didn't you say that?

A. "I said it in the presence of Mr. Wilson that came in to identify him. There was a man by the name of Wilson who some of the officers sent in to me.

Q. "Did that occur in Wilson's presence?

A. "Yes.

The court: "But the colored woman wasn't there? (Exception to the question of the court.)

A. "No."

This remark of the court, whether regarded as a statement of fact indicating the opinion of the court that the witness Hattie Reed was not present for the purpose of identifying the plaintiffs in error until after the officer determined that sufficient opportunity had been given for an identification and none had been made and that the prisoners should be returned to their cells, or as a question addressed to the officer to elicit a reply from the witness bearing upon the point, constituted error which in its effect may have been so prejudicial to the rights of the plaintiffs in error upon such a material point as to call for a reversal of the judgment. If the remark is to be regarded as a statement indicating a condition of mind or belief of the court from the facts involved in the determination of the crucial point in the case, viz., the ability of the witness Hattie Reed to identify the plaintiffs in error as the guilty parties, its prejudicial effect upon the minds of the jury is too manifest to be questioned or debated. If regarded as an interrogatory, it was leading and suggestive to such a degree that had it been propounded by counsel for the State it would have been error to overrule an objection to it. The vice of a leading question, when propounded by counsel, is, that it suggests to the witness the answer which is desired. When propounded by the court it has the additional vice of being understood by the jury as indicating the view entertained by the court as to the fact suggested

by the question.   However regarded, it operated to pro-
duce the positive assent of the inspector to the statement
of fact contained in the remark of the court, that the
witness Hattie Reed was not present and had not stood
in the presence of the plaintiffs in error for the purpose
of identifying them without making such identification,
until the officer, believing she was unable to do so, had
directed the plaintiffs' in error to be returned to their
cells.   That the remark of the court had an improper in-
fluence on the mind of the witness is unmistakable.   The
witness assented the fact stated by the court was true,
but on cross-examination, in effect, qualified his assent to
the remark of the court to the extent of saying he could
not remember whether the colored woman was there or
not.   The impression to be made upon the minds of the
jury by the testimony bearing upon the question of the
ability of Hattie Reed to recognize the plaintiffs in error
to be the persons whom she saw engaged in the affray with
the deceased was of the utmost importance to the rights
of the plaintiffs in error.   If, in addition to all the other
circumstances which tended to weaken her statements
that she could and did recognize the plaintiffs in error
as the persons she saw when looking down from the win-
dow in the fourth story of the hotel, it should be made
to appear from the evidence that she, when brought into
the inspector's office for the purpose of pointing out the
plaintiffs in error as the persons she saw in the alley,
had them brought into her presence and kept there with-
out any action, words or otherwise on her part indicating
recognition of them, and that the inspector ordered them
returned as not identified, it was important to the devel-
opment of the truth and to the preservation of the rights
of the plaintiffs in error such fact should be made known
to the jury.   Was she in the inspector's office while the
plaintiffs in error were kept there by the inspector for
identification by her and before he sent them out?—was
a question for the determination of the jury.   Whether so

intended or not, the expression or remark of the court, even though regarded as an interrogatory, strongly indicated the impression of the court, gained from the evidence, that she was not present until after the inspector, regarding the attempt at an identification as having failed, had removed the plaintiffs in error from the room with the remark, "What the hell kind of identification is this? Take them out," and further was so suggestive and leading in form as to fall under the ban of condemnation for that reason.

Counsel for plaintiffs in error justly prefer a complaint that the court by another remark invaded the province of the jury to determine a question of fact. It appeared from the testimony of the coroner's physician, who testified in behalf of the People, that the only evidence of external violence on the body of the deceased, Hartman, was a bruise over the left eye, about one inch in length and three-fourths of an inch in width, and another small bruise on the bridge of the nose, and that neither of such injuries was a mortal wound. The said physician further testified: "There was no fracture of the skull, no inflammation of the windpipe whatever. I found only a small bruise, one inch long by three-quarters wide, over the outer canthus of the left eye, and also a small bruise on bridge of nose. The brain was in good condition. The scalp was in good condition and there was no fracture of the skull. The injuries may have produced syncope. Syncope is a cardiac failure of the heart. I think it did in this case. The shock would affect the whole system, but its main portion would be on the nervous system. There would be no trace of shock. Besides the injury, I found a large cystic kidney. A cystic kidney is where kidneys are filled up by albumen and saline matter, and otherwise there is a failing in the color fluids. The right kidney was enlarged to twice its normal size and performed the functions for both kidneys. The left kidney

was totally destroyed by cystic degeneration. The stomach showed evidence of chronic gastritis. It was inflamed, and had old, dark and possibly alcoholic streaks. The stomach indicated he was a man who drank. I found the liver fatty and containing dark blood, and the heart quite large and fatty. The heart indicated that there may be a weakening of the heart at times. The lungs were dropsical,—water-soaked and congested. This would indicate that the circulation might be impeded. The condition of the kidneys would produce that. I could not say whether people die suddenly from it or not. With the heart enlarged and fatty a man could drop dead from any excitement—of running after a street car or walking up-stairs. Any degree of excitement at all is liable to produce sudden death. Gastritis produces an inflammation of the stomach, and the whole system is affected. The elements that were found in this body, of fatty degeneration of the heart and lungs water-soaked and congested, may produce sudden death. The conditions there may."

The testimony of Daisy Drummond, so far as it bore upon the injuries inflicted upon the deceased by whomsoever assaulted in the alley, was that he was struck with a blow of the fist. She further testified: "When he was first struck he didn't get right up for a moment. He sat there in the position he was sitting in when they ran away. He fell on his face. The alley is paved. I saw the paving stones. He seemed to fall very hard. After they left the old man he sat a moment, then got up on his feet, and he kind of put up his hand as if going to fall. He put his hands up and fell down on his head, to the north. He fell out from the doorway in the alley. His face was on the pavement. He lay on his face." Hattie Reed, after stating that Hartman received a blow on his head with a fist, testified: "Then the old man got up and started to walk, and he staggered and fell in the middle of the alley. I don't know how far he walked be-

fore he fell in the middle of the alley. He fell forward on his face." The testimony showed, without controversy, that the alley was paved with cobble-stones.

The tendency of the testimony of all the physicians who testified in the case, both on behalf of the People and of the plaintiffs in error, was to the effect that the vital organs of the deceased, Hartman, were so affected by disease as to cause death at almost any time; that any kind of emotion, excitement or exercise might prove fatal to him. The physicians all agreed that the bruises were not of themselves sufficient to cause the death of a person in a normal condition of health, but also all were of the opinion that a very slight shock to his nervous system, produced by any cause, might properly be regarded as a contributory element to the cause of death. Counsel for the People, in their brief, state their position upon the point as follows: "It was the contention of the State that while the injuries received by the deceased at the hands of plaintiffs in error were not *per se* mortal injuries, yet they were such injuries as accelerated and brought on death, and that death was caused by blows and injuries which would not have caused the death of a healthy person, but which, in fact, did cause the death of the deceased. The fact that the person killed was in a feeble condition would be no defense. A wound to such a person would be mortal to him when it would not be a mortal wound *per se*."

It was a question for the jury to determine whether the bruises upon the head of the deceased were caused by the blow from the fist or by the fall upon the pavement, and whether the fall upon the pavement was because of an injury or shock resulting from the blow, or from drunkenness, or from the effects of his many ailments. The evidence of the physician for the coroner was that the stomach of the deceased indicated that he was a man who drank alcoholic liquors; that his stomach was inflamed, and was marked by old, dark and pos-

sibly alcoholic streaks. The testimony of the plaintiffs in error was to the effect that the deceased, when they first saw him with (as they claim) Taylor, was in a drunken condition and staggering. It was a question to be determined by the jury as a question of fact, not only what produced the bruises and whether the shock which produced his death was caused by the blow which he received or by the fall upon the pavement, but also whether the fall upon the pavement was caused by or as the effect of the blow or because of his intoxication, if he was intoxicated, or from his diseased and enfeebled condition of body.

In the course of the attempts of counsel for the plaintiffs in error to frame a hypothetical question designed to elicit from the physician an opinion as to the cause of death, the court interrupted counsel with this remark, in the presence of a jury: "Why don't you say the bruise was caused by a blow from a fist?" Counsel objected, and excepted to the remark of the court on the ground that it was a question to be determined from the evidence whether the bruise was caused by the fall on the pavement or by a blow from a fist. Counsel again endeavored to frame the question, and when he had completed it as he desired to ask it, the court made the following remark: "Hadn't you better add to that that the bruise was produced by a blow of the fist and that he was choked?" In endeavoring to frame a like question to be propounded to another physician, counsel again insisted, in a colloquy which arose between the court and counsel, upon the view, substantially, that it was a question of fact as to what caused the bruises, and said there was no direct evidence upon the point. The court responded: "Oh, yes, there is; by a blow of the fist." These remarks of the court were expressive of his deductions from the evidence upon a question of fact which it was the province of the jury to determine, and upon which it was the right of the plaintiffs in error to have the

decision of the jury uninfluenced by any opinion entertained by the court.

Another incident of the trial may have operated to the serious detriment of the plaintiffs in error. It will be remembered the indictment charged the plaintiffs in error and Harry A. Taylor and Patrick Kane with the crime of murder in the killing of said Hartman. The authorities were not able to apprehend Taylor and Kane, and plaintiffs in error were placed upon trial together. All of the testimony concurred in the view only two persons were concerned in the assault upon Hartman. The plaintiffs in error testified that the assault upon Hartman was committed by Taylor and Kane. The testimony of the witness Hackett was that the plaintiffs in error did not commit the assault and that he saw two other men engaged in the affray with Hartman. The plaintiffs in error presented as a defense to the charge against them, that it was Taylor and Kane, and not the plaintiffs in error or either of them, who assaulted Hartman, and their testimony, if credited by the jury, established this defense, and the testimony of the witness Hackett, if worthy of credit, corroborated that of the plaintiffs in error and acquitted them of all connection with the crime. In the argument of counsel for the plaintiffs in error to the jury this defense, and the evidence bearing upon it, was discussed and pressed upon the attention of the jury. In the course of the closing argument for the People before the jury, counsel for the State, addressing the court and jury, said: "May it please your honor and gentlemen of the jury, there is nothing to the contention of counsel for the defendants that Taylor and Kane, or any one else but the defendants, assaulted Peter Hartman. I now ask the court that a *nolle prosequi* be entered on this indictment as to Taylor and Kane and the case dismissed as to them." Counsel for the plaintiffs in error objected to this line of argument and to the course proposed to be pursued as to the charges against Taylor and Kane, but

the court overruled the objection and allowed the motion that a *nolle prosequi* be entered as to Taylor and Kane to be interjected into the argument of counsel for the People, and in the presence of the jury ordered a *nolle prosequi* to be entered as to said Taylor and Kane on all the counts of the indictment. To this ruling and action of the court counsel for plaintiffs in error saved their exceptions.

We need not enter into a discussion as to the power of the State's attorney to enter a *nolle prosequi* with or without the consent of the court, or as to the discretion resting in the court to control the disposition of criminal causes pending before him. It was unquestionably within the power of the court to decline to permit the attorney for the State, in the midst of his argument to the jury, to stop the argument and address a motion to the court with reference to the disposition of criminal charges against other persons than those upon trial before the jury. The real purpose to be attained by the motion was manifestly not the disposition of the indictment against Taylor and Kane. This was only the ostensible purpose, the ulterior design being to add weight to the argument that the defense that Taylor and Kane were the guilty parties had no support in the proofs. Under all the circumstances the action of the court in granting the motion of the representative of the State that a *nolle prosequi* of the charges against Taylor and Kane be entered would naturally be received by the jury as an approval by the court of the assertion with which counsel for the State accompanied the request for a *nolle prosequi*, that there was nothing in the contention of the plaintiffs in error that Taylor and Kane were the persons who assaulted the deceased, Hartman. It was entirely proper for counsel for the State to argue, all the evidence being considered, the defense that the assault made upon Hartman was made by Taylor and Kane, and not by the plaintiffs in error, had failed, but it was entirely indefensible to permit such counsel to bring to the aid of the argument

the power and weight of an approval by the court of the position assumed. The purpose in pausing in the closing argument and asking that the court should officially dispose of the charges against Taylor and Kane was, as we have said, an ulterior one, but that the ostensible purpose was not the real one was manifest and palpable, and the effect upon the jury of the entry of a *nolle prosequi* under such extraordinary circumstances was so plainly prejudicial to a fair and impartial trial of the guilt or innocence of the plaintiffs in error, that the action thus taken by the counsel for the State and by the court must be declared error of such serious and prejudicial character as to demand the reversal of the judgment of conviction.

Notwithstanding the solemn declaration of counsel for the People that the evidence demonstrated that Taylor and Kane had no connection with the death of Hartman, and notwithstanding such counsel felt called upon by the state of the proof, as he claimed it to be, to dismiss the prosecution as to Taylor and Kane, and notwithstanding the court permitted counsel to stop in the course of his argument to the jury to ask that a *nolle prosequi* be entered and granted the motion, still counsel sought, and the court granted, an instruction to the jury which could but be understood by the jury to authorize them to return a verdict of guilty against the plaintiffs in error on the theory the plaintiffs in error aided, abetted and assisted Taylor and Kane to kill and murder Hartman. The instruction is as follows:

"The court instructs the jury that in order to find the defendants in this case guilty of the killing of the deceased, Peter Hartman, it is sufficient if they combined with those committing the deed to do an unlawful act, such as to beat or rob the deceased, and that he was killed in the attempt to execute the common purpose. If several persons conspire to do an unlawful act and death happens in the prosecution of the common object, all are alike guilty of the homicide. The act of one of them

done in furtherance of the original design is, in contemplation of law, the act of all."

The instruction carried a suggestion to the jury, as coming from the court, that even should the jury believe, from the testimony, that Taylor and Kane were the persons whom the witnesses for the People saw engaged in assaulting Hartman, still a verdict convicting the plaintiffs in error would be authorized by the evidence on the ground they were accessories to the commission of the crime. The record is barren of any testimony justifying the application to the case, as against these two plaintiffs in error, of the doctrine of the criminal law with reference to principals and accessories. The testimony produced in behalf of the State, and that in behalf of the plaintiffs in error, was to the effect that Hartman was assaulted by but two men. One witness in behalf of the People identified the plaintiffs in error as being the assailants of the deceased. The testimony of the plaintiffs in error and of the witness Hackett was that the assailants of Hartman were not the plaintiffs in error but two other persons, and the plaintiffs in error identified the assailants as being Taylor and Kane. There was not a scintilla of proof that Taylor and Kane and the plaintiffs in error were acting in concert, or that the plaintiffs in error aided, abetted, counseled or advised or were in any way accessories to the acts of Taylor and Kane. It was error to grant this instruction.

It is urged other erroneous rulings were made by the court in granting and refusing instructions. Instruction No. 1 asked by the plaintiffs in error should, we think, have been given. It was addressed to the presumption that the plaintiffs in error were innocent of the offense charged against them, and advised the jury clearly and fully as to the effect to be given a reasonable doubt of guilt. The Attorney General concedes the instruction to be correct. It was so, unquestionably. Under the state of the evidence the instruction touched upon questions

of the greatest gravity and moment. The suggestion of the Attorney General that instruction No. 23, given at request of the People, sufficiently instructed the jury as to the presumption of innocence and rule as to a reasonable doubt of guilt, cannot be accepted. The purpose of that instruction, though it recognized the presumption and the necessity of establishing guilt beyond a reasonable doubt, was to minimize the effect of both principles. Defendants' instruction No. 16 bore upon the questions, but it and instruction No. 1 might well both have been given, and the latter was by no means the equivalent of the former. Other complaints as to the action of the court in ruling on instructions are in the main groundless, and may be the more speedily disposed of by a general statement of the legal principles involved therein.

The rule of law is well established that if a person who is enfeebled by disease is unlawfully assaulted, and an injury inflicted upon him which would not have been mortal to a man in ordinary good health but which was mortal to him in his then physical condition, the assailant is to be deemed, in law, guilty of unjustifiable homicide, either murder or manslaughter, as the case may be, and that though the assailant did not know the enfeebled condition of the person assaulted. In such state of case the legal presumption is, not only that the probable and necessary consequences of the assault were intended, but the possible consequences also. If the assault was committed in the perpetration of a felony, the killing would be murder. It is immaterial, in respect of criminal responsibility, that the injuries but hastened the death of the person assaulted, for, as expressed by ancient writers and judges, "the offender may not apportion his own wrong." 9 Am. & Eng. Ency. of Law, (1st ed.) pp. 534, 535, and cases cited in notes; 2 Bishop on Crim. Law, secs. 637, 638, 696; Kerr on Law of Homicide, secs. 29, 32, 33; 3 Greenleaf on Evidence, secs. 139, 141; 1 McLean on Crim. Law, sec. 292; 1 Hale's P. C. 428; Roscoe on Crim.

Evidence, (4th ed.) 695; 1 Russell on Crimes, 505; *Sludall v. State*, 7 Ga. 2; *State* v. *Morea*, 2 Ala. 275; *Williams* v. *State*, 2 Tex. App. 282; *Rex* v. *Webb*, 1 M. & Rob. 405; *Rex* v. *Martin*, 5 Car. & P. 130.

As to the question of the cause of death in the case at bar: If the deceased received a blow with the "fist," and the injury directly produced by the blow extinguished the spark of life, no matter how feeble the spark, the blow should be regarded as the cause of death. If the blow so physically affected the deceased as that from the injurious effects thereof he was rendered unable to stand and walk, and as a consequence fell upon the cobble-stones and death resulted from the fall, the blow is to be regarded as the cause of death, even though it might not, within itself, have proven mortal. (2 Bishop on Crim. Law,—7th ed.—sec. 637.) If death results indirectly from a blow through a chain of natural causes, unchanged by human action, the blow is regarded as the cause of death. (*Kelly* v. *State*, 53 Ind. 311.) If the injuries which caused the death of Hartman proceeded from the fall upon the pavement, and his inability to stand erect arose wholly from one or more of his many physical infirmities and afflictions or from intoxication, and such inability to maintain an upright position was not contributed to, mediately or immediately, by the blow, his death should be attributed to natural causes. These observations, it is believed, will enable the trial court, on a rehearing of the case, to correctly declare the legal principles involved in this branch of the case.

The plaintiff in error Cunningham was above twenty years of age, but had not reached the age of twenty-one, at the time Hartman came to his death. It is insisted a defendant cannot be sentenced to imprisonment in the penitentiary for an offense committed before such defendant had arrived at the age of twenty-one years. This is a misapprehension as to the meaning of the statute. Section 9 of chapter 118, (Hurd's Stat. 1899,) entitled "Re-

formatory," etc., provides the inmates of the reformatory
shall be divided into two divisions or departments, the
first to include those between the ages of ten and sixteen
years and the second those between the ages of sixteen
and twenty-one years. Section 10 of the act requires
that the verdict upon which a defendant is sentenced to
be confined in the reformatory shall find whether or not
the defendant is between the ages of ten and twenty-one,
and shall find, as nearly as may be, the age of the de-
fendant. Section 12, in conformity with sections 9 and
10, provides: "Any court in this State exercising criminal
jurisdiction may sentence to the said reformatory any
male criminal between the ages of sixteen and twenty-
one, and not shown to have been previously sentenced
to a penitentiary in this or any other State or country
upon the conviction, in such court of such male person
of a crime punishable under existing laws in a peniten-
tiary;" and the same section requires the board of man-
agers of the reformatory to receive into the institution
under their charge all male criminals of the class afore-
said, namely, between the ages of ten and twenty-one
years. The reformatory was established in conformity
with the conviction which had found lodgment in the
public mind that the time of the detention of youthful
offenders against the criminal laws ought to be availed
of to instruct the conscience, cultivate the intellect of the
offender and train him to the knowledge of some useful
trade or occupation. It was the theory the benefits of
such an institution could not be extended to those who
had passed beyond the period of life usually devoted to
the purposes of education and training for an occupation
or trade, nor thought advisable older criminals should
be associated with those of more youthful years. The
reformatory was therefore organized for the reception of
persons not above the age of twenty-one years, the gov-
erning purpose being to receive only those persons who
are of such immaturity of years as to be susceptible to

the advantages of training and discipline. It is the age of the offender at the time when it becomes necessary to determine the place of his detention which must control his sentence.

The judgment of conviction is reversed as to each of the plaintiffs in error, and the cause is remanded to the criminal court of Cook county for such further proceedings as to law and justice shall appertain.

*Reversed and remanded.*