THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES HUMBLE, Defendant-Appellant.

(No. 71-256;

Fifth District—April 2, 1974.

Robert E. Farrell, Deputy Defender, of Mt. Vernon (Richard E. Cunningham, Assistant Appellate Defender, and Daniel Tobin, Senior Law Student, of counsel), for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (P. J. O'Neill, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

The defendant, James Humble, was charged by indictment in Madison County with the crime of murder. Trial was held to a jury and the jury returned a verdict of guilty to the lesser included offense of voluntary manslaughter. The defendant's post-trial motions and application for probation were denied. The court then sentenced the defendant to serve a term of not less than 2 nor more than 8 years in the Illinois State penitentiary system. The defendant has brought this appeal asserting that the State failed to prove the defendant guilty beyond a reasonable doubt and that the court erred in the instructions to the jury.

On the evening of March 21, 1971, the events which led to the defendant's conviction and this appeal unfolded. The defendant along with Thad Harrell, "Trigger" Terrell and Alvin Thompson, the victim, left the Madison Garrett Pool Room, also known as Venice Pool Hall, in Venice, Illinois. The defendant told Thompson that Thompson had forgotten his coat whereupon the defendant returned to the pool room and brought back a coat for Thompson. Thompson, Terrell and the defendant then left to go to a liquor store.

Later the defendant returned to the pool room and gave the coat to the manager of the pool room. The true owner of the coat, Carl Waters, attacked and beat the defendant. The defendant attempted to get Thompson to explain to Waters what happened with the coat but Thompson refused. The testimony of the witnesses differed as to whether or not Thompson also participated in the defendant's beating.

Subsequent to the beating the defendant left the pool room. Again there is a variance in the testimony as to the length of time the defendant was gone from the pool room but testimony other than the defendant's did indicate a minimum of 5 minutes; Harrell testified that the defendant was gone for 20 minutes; Waters testified 7 or 8 minutes and Terrell testified 5 to 10 minutes. The defendant in testifying in his own behalf said that he staggered outside the pool room, saw more men outside whom he testified he thought were going to attack him again, so he picked up a pipe and ran back into the pool room.

Testimony was that upon returning to the pool room the defendant struck the deceased with whatever he had in his hand. The defendant admitted that the object was a pipe. The deceased expired. There was testimony to show that prior to the deceased being struck that the deceased had held up a pool stick. One witness, Mr. Terrell, testified that the deceased did not raise the pool stick until after he was hit by the defendant and that after the pool stick was raised the defendant struck the deceased twice more whereupon the deceased collapsed and never again regained consciousness. There was no testimony other than the

defendant's that the deceased ever struck the defendant either during the first altercation or the second when the defendant returned into the pool room.

The Madison County Coroner, Robert Thomas, testified that he examined the body of the deceased and the only mark found on the deceased was a slight abrasion over the nose.

The final State witness was Dr. Francisco Campos, a pathologist of 22 years. He testified that on March 22, 1971, he had performed an autopsy on the deceased. The witness first made an external examination of the body. He found that there was an abrasion with a small amount of skin discoloration over the right side of the nose and that the right wrist was swollen and possibly fractured.

The internal examination by the witness revealed that the deceased had a persistent thymus. He explained that this is an organ which should shrink up and go away after puberty but that the deceased's thymus was five times the normal size. The doctor diagnosed the cause of death as status thymicolymphaticus. He also stated that the condition exists from birth and renders a person in a weakened condition, thereby making the person susceptible to sudden death from trivial trauma, shock or fear. The doctor further testified that a person with this condition could die suddenly where no shock or fear was apparent and the cause precipitating death could not be determined. He also testified that status thymicolymphaticus renders the adrenal gland smaller than normal, causing a loss of body sugar, but he stated that science has been unable to explain why the body is not able to cope with this malady.

Finally the doctor testified in response to the State's hypothetical question that he was not positive as to three blows causing the deceased's death based upon the autopsy and reasonable medical certainty.

■■ The defendant first asserts that the *corpus delicti* of the offense of voluntary manslaughter was not established beyond a reasonable doubt. There is no doubt that such proof is necessary to sustain the conviction. (*People v. Manske*, 399 Ill. 176, 77 N.E.2d 164; *People v. Bailey*, 56 Ill.App.2d 261, 205 N.E.2d 756.) The defendant's assertion is based upon the testimony of the pathologist. The doctor stated that although he was not certain that the three blows caused the death that the blows may have caused the death. The *corpus delicti* in a homicide case consists of proof that the death was caused by the criminal agency of some person. (*People v. Watts*, 101 Ill.App.2d 36, 241 N.E.2d 463.) The defendant asserts that because of the doctor's testimony that there was not proof beyond a reasonable doubt that the death was caused by the defendant. The State does not have the burden of proving guilt beyond any possibility of doubt. (*People v. Branion*, 47 Ill.2d 70, 265 N.E.2d 1;

*People v. Hunter*, 3 Ill.App.3d 676, 279 N.E.2d 490.) The defendant's conviction need not be reversed, therefore, merely because there is a possibility that his criminal agency did not cause the death.

The defendant cites *People v. Benson*, 19 Ill.2d 50, 166 N.E.2d 80, a case in which the supreme court reversed a murder conviction. In that case, a 69-year-old woman died shortly after she had been raped by the defendant. The doctor who performed an autopsy on the woman testified that she had been suffering from brain lesions which had caused seepage of blood into the brain for weeks or months prior to the decedent's death. The doctor stated that in his opinion the death resulted from a combination of several things and that the main thing was the sexual assault in conjunction with the recent brain damage. He also stated that a lesser cause was the older brain lesions. The court reversed the murder conviction because it was not proved beyond a reasonable doubt that death resulted from criminal agency and stated:

> "* * * it is a maxim of our law that where an act may be attributed to a criminal or to an innocent cause it will be attributed to an innocent cause rather than to the criminal one. A crime is never presumed where the conditions may be explained on an innocent hypothesis." 19 Ill.2d at 61, 166 N.E.2d at 86.

The *Benson* case, however, is distinguishable from the instant case. In *Benson* the evidence showed that it was very possible that the deceased died from a cause, the brain lesions, which was completely independent from any criminal act by the defendant. It was possible, in other words, that the deceased would have died from the brain lesions whether she was sexually attacked or not. In the instant case, the physical defect of the decedent would not cause death unless triggered by some event. There is evidence that the triggering event was the defendant's criminal agency. Also, in *Benson* there was no evidence of how the sexual attack could have combined with the physical condition of the woman to cause death. In this case there is medical testimony that the attack by the defendant could very likely have combined with the decedent's physical condition to cause death.

The case of *Cunningham v. People*, 195 Ill. 550, 63 N.E. 517, is nearer the present factual situation. In *Cunningham* the evidence indicated two men robbed the decedent and punched him in the head. The decedent then got up, staggered a few feet, fell down, and died soon thereafter. Medical evidence indicated that the man's heart was in such a condition that any excitement at all could have produced a sudden death. Although the defendant's conviction of manslaughter was reversed for other reasons, the court stated:

> "It was a question for the jury to determine whether the bruises

upon the head of the deceased were caused by the blow from the fist or by the fall upon the pavement, and whether the fall upon the pavement was because of an injury or shock resulting from the blow, or from drunkenness, or from the effects of his many ailments." 195 Ill. at 566, 63 N.E. at 523.

■■ We therefore hold that it is a factual question for the jury to decide whether the death was caused by the criminal agency of the defendant. There is adequate competent evidence in the record to support the jury's findings.

It is undisputed that the defendant had a fight with Carl Waters in the pool room before he struck the deceased. The defendant claimed that Thompson, the deceased, aided Waters in that altercation by striking the defendant with a pool stick. The defendant admitted that he then went outside, picked up a pipe, went back into the pool room and, because Thompson had his pool stick up in the air, struck the deceased with the pipe. Harold Terrell stated that while the defendant and the deceased were in Garrett's Pool Room, he was across the street in Garrett's Tavern. He went to the pool room when he heard that the defendant was being beat up, and when he got there the defendant was dirty and bleeding, and Thompson was shooting pool. Terrell stated that if there had been an incident between Carl Waters and the defendant, he had not seen it. Terrell testified that he then went to the washroom, and soon after he came out he saw the defendant entering the pool room with something like a stick in his hands. Terrell said that when Thompson turned around with the pool stick, the defendant hit Thompson in the side. The deceased then raised the pool stick, the defendant struck the pool stick and hit Thompson in the side, and the defendant then hit Thompson for the third time in the lower part of his body.

Carl Waters testified that he went across the street to Garrett's Tavern after he had the fight with the defendant. Waters said that 7 or 8 minutes later he noticed the defendant walking up the street with something like a stick or a cane in his hand. Waters then went back to the pool room and stated that he saw the defendant and Thompson fighting. He further testified that the defendant swung at Thompson and that Thompson fell to the floor, but he never saw the defendant actually hit Thompson.

Waters testified, however, that he got to the pool room while the fight was going on and that the defendant might have hit Thompson earlier. Considering this with Terrell's testimony that the defendant struck Thompson three times, it was not unreasonable for the jury to find that the defendant struck Thompson and caused the death.

It is also relevant that Thompson collapsed immediately after being struck. Charles Wright testified that he was in Garrett's Tavern when he

was told that Thompson, an acquaintance, was on the floor in the pool room. He immediately went to the pool room and saw that Thompson was gasping for breath. Thompson took a few breaths and Wright heard no more. Wright then searched for a heartbeat and got no reaction. Thad Harrell also testified that he came from the tavern into the pool room immediately after the incident. He stated that Thompson was lying on the floor for about ten minutes until the ambulance came and that Thompson never moved during that time. Robert Thomas, the Madison County coroner, stated that Thompson was dead on arrival at St. Elizabeth's Hospital. It was not unreasonable for the jury to decide that this testimony ruled out any reasonable hypothesis that the death could be attributed to an innocent cause.

Since the criminal agency of the defendant triggered the death of the deceased, his conviction need not be reversed merely because the blow would not have killed a man who was in good health. In *Cunningham,* the supreme court stated:

> "The rule of law is well established that if a person who is enfeebled by disease is unlawfully assaulted, and an injury inflicted upon him which would not have been mortal to a man in ordinary good health but which was mortal to him in his then physical condition, the assailant is to be deemed, in law, guilty of unjustifiable homicide, either murder or manslaughter, as the case may be, and that though the assailant did not know the enfeebled condition of the person assaulted." (195 Ill. at 572, 63 N.E. at 525.)

In *People v. Brown,* 9 Ill.App.3d 730, 293 N.E.2d 1, the defendant allegedly beat the deceased to death, but medical testimony indicated that death would not have resulted if the deceased had not been drunk. The Court upheld the involuntary manslaughter conviction citing the following language from *People v. Meyers,* 392 Ill. 355, 64 N.E.2d 531, 533:

> " 'The law is that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant.' " (9 Ill.App.3d at 734-735, 293 N.E.2d at 4.)

The *corpus delicti* in the instant case was proved beyond a reasonable doubt.

The defendant also asserts that the evidence overwhelmingly supported his theory of self-defense. It is uncontradicted that the defendant was in a fight with Carl Waters in Garrett's Pool Room. The elapsed time between this fight and the striking of Thompson may be important. The defense claims that Waters and Thompson beat him, that he left the

pool room only for a few moments, that he came back into the pool room with the pipe because he feared another beating from some men outside the pool room and that he then struck the deceased when Thompson raised his pool stick. The defendant contends, therefore, that Carl Waters and the deceased were the aggressors and that they remained the aggressors.

It must first be noted that the defendant's testimony to the effect that Thompson had hit him is uncorroborated. The evidence does not directly contradict the defendant's statement, but Carl Waters' testimony indicates that the first fight was only between himself and the defendant. Waters was not asked whether Thompson had assisted him in the fight.

Even if it were to be determined that Thompson had joined in the beating of the defendant, is seems clear that the defendant was not defending himself from this beating when he later struck Thompson. The defendant's testimony that he left the pool room only for a moment and returned immediately with a pipe is contradicted by the testimony of Waters, Harrell and Terrell. Waters stated that after he had the fight with the defendant, he (Waters) went across the street to Garrett's Tavern. About 7 or 8 minutes later Waters allegedly observed the defendant walking toward the pool room with something like a stick or cane in his hands. It was not until this time that the defendant allegedly entered the pool room and struck Thompson. Harrell told a similar story and stated that, after the fight with Waters, the defendant left the pool room. According to Harrell, there was not anyone waiting outside the pool room for the defendant when he left. Harrell stated that after the fight, Waters and he went across the street to the tavern, and about 20 minutes later, he saw the defendant walking toward the pool room with a pipe or stick in his hand. When Harrell went over to the pool room again, Thompson was lying on the floor, and some other men were kicking the defendant. Terrell testified that he arrived at the pool room after the fight between Waters and the defendant. He then went to the restroom and came out about 5 minutes later. At this time Terrell saw the defendant come into the pool room carrying a stick with which he hit Thompson.

The testimony of Waters, Harrell and Terrell indicates that several minutes passed from the time of the fight between Waters and the defendant until the incident in which the defendant struck Thompson. Therefore, even if Thompson had joined in the earlier attack upon the defendant, he should not be considered the aggressor in the later incident.

The defendant asserts that he reentered the pool room carrying an object for his own protection. Based upon the evidence this claim is

unfounded. The defendant's explanation at trial was that he immediately reentered the pool room because of a threatening group of men outside. As previously noted, however, the testimony of Waters, Harrell and Terrell indicates that the defendant left the pool room for several minutes.

██ The defendant also mentions testimony that Thompson raised his pool stick when the defendant entered the room with a pipe in his hands. It does not seem unreasonable that he would do so if he feared an attack by the defendant. There is no evidence that Thompson threatened to hit the defendant with a stick at this time. Even the defendant did not make such a claim. He stated that Thompson had the stick up, so the defendant hit him. It is suggested, therefore, that it was not unreasonable for the jury to determine that the defendant was not acting in self-defense.

The defendant next claims that the trial court erred in instructing the jury. The defendant had been charged with murder, and he asserted the defense of self-defense. At the instructions conference the defendant offered an instruction defining self-defense, and it was accepted. The State offered two instructions defining the offense of voluntary manslaughter. The first was I.P.I. Criminal Instruction 7.03 which defines voluntary manslaughter as the killing of an individual by one acting under a sudden and intense passion resulting from serious provocation. The defense objected to this instruction, but it was given. The State also offered I.P.I. Criminal Instruction 7.05 which defined voluntary manslaughter as an intentional and knowing killing committed in the belief that the circumstances were such that the killing was done in self-defense, but the belief was unreasonable. The defense counsel stated that he objected to both 7.03 and 7.05, but that if one of those instructions should be given, it should be 7.05 and not 7.03. Since the court had already accepted 7.03 the judge told defense counsel to object to 7.05 or accept it. In fact, the court specifically told defense counsel that it was up to him whether 7.05 would be given. Counsel replied that he would stand on the record with his objection, and Instruction 7.05 was denied. It is obvious, therefore, that the defendant is the party who prevented the giving of Instruction 7.05.

The defendant maintains that, even though he objected to 7.05, the court erred by failing to give that instruction. The defendant cites *People v. Sweeney*, 114 Ill.App.2d 81, 251 N.E.2d 897, for the proposition that a defendant is entitled to any instruction favorable to his theory of the case if there is any evidence at all supporting that instruction. In *Sweeney*, however, the defendant had tendered an appropriate instruction, and it was refused. That case does not hold that an instruction

favorable to the defendant must be given even though it has not been offered by the defendant, and in fact, if it has been objected to by him.

The defendant also relies on the Committee Note following I.P.I. Criminal Instruction 7.05 which states:

> "When the charge is made, the defense is self-defense, and the proof supports a voluntary manslaughter instruction and verdict, the order of instruction should be: Instruction 7.01 (Murder); Second, this Instruction 7.05; Third, applicable instruction from Chapter 24—Defenses."

The defendant seems to be asserting that the Committee Note requires that, when murder is the charge and self-defense is claimed, Instruction 7.03 cannot be given and 7.05 must be given. We do not agree with such a construction of the Committee Note. At most the note states a requirement that 7.05 should be given if requested. At the least, the note merely suggests the order in which the instructions should be given if they are offered and accepted.

The defendant cites *People v. Johnson*, 1 Ill.App.3d 433, 274 N.E.2d 168, in which a murder conviction was reversed because the trial court refused to give Instruction 7.05. The court stated:

> "When the trial court determined that the facts in evidence justify or require the giving of an instruction on the justifiable use of force, there are, in fact, three alternatives for the consideration of the jury, *i.e.*, (1) murder, (2) that the use of force was justified and self defense was demonstrated, or (3) that while the defendant might have believed that the use of force was necessary under the evidence, such belief was unreasonable." (1 Ill.App.3d at 435, 274 N.E.2d at 170.)

The defendant cites this language again seemingly suggesting that, when murder is the charge and self-defense is claimed, Instruction 7.03 cannot be given and 7.05 must be given.

In *Johnson*, there was absolutely no evidence which could have justified that giving of 7.03. Where the court mentioned the three alternatives available for the jury's consideration, therefore, it was referring to such a case in which 7.03 was not appropriate. The court was not saying that, in a proper case, 7.03 could not be given as well as 7.05 and thus create a fourth alternative for the jury to consider. *Johnson* should not be read, therefore, as a holding that 7.03 can never be given when the defendant is alleging self-defense.

*Johnson* did hold, with one judge dissenting, that 7.05 must not be refused if a self-defense instruction is given. *Johnson* is distinguished from the instant case, however, because the defendant in that case

offered 7.05 and it was refused. *Johnson* does not hold that failure to give 7.05 is error if the defendant had not requested that instruction.

In *People v. Zertuche*, 5 Ill.App.3d 303, 282 N.E.2d 201, the appellate court followed *Johnson* and held that if a self-defense instruction was appropriate, then 7.05 should have been given. In *Zertuche*, however, the defendant had specifically requested Instruction 7.05, and it was denied. We have found no cases in which a reviewing court has reversed a conviction for the failure to give an instruction which the defendant had not requested.

■■ The law is well settled that a trial court does not have to provide an instruction on its own initiative. In *People v. Caldwell*, 39 Ill.2d 346, 236 N.E.2d 706, the Illinois Supreme Court affirmed a murder conviction in which no manslaughter instructions were given. The court stated:

> "We find therefore that the trial judge had no responsibility to give a manslaughter instruction on its own initiative when defense counsel failed to tender one." ( 39 Ill.2d at 355, 236 N.E.2d at 712.)

In *People v. Coddington*, 123 Ill.App.2d 351, 259 N.E.2d 382, this court upheld a murder conviction over the defendant's contention that the court erred in failing to give an instruction regarding the testimony of an accomplice. This court cited *Caldwell* and stated:

> "In any event, if such an instruction were appropriate on this issue, the record discloses that defendant failed to submit one. And since the trial court is under no duty to give an instruction on its own motion, the defendant should not now be heard to complain of this error." ( 123 Ill.App.2d 371, 259 N.E.2d at 392.)

Several other cases have recently recognized the rule that a trial court need not give an instruction on its own initiative. *People v. White*, 8 Ill.App.3d 416, 291 N.E.2d 46; *People v. Holt*, 7 Ill.App.3d 646, 288 N.E.2d 245; *People v. Lenker*, 6 Ill.App.3d 335, 285 N.E.2d 807; *People v. Day*, 2 Ill.App.3d 811, 277 N.E.2d 745.

The defendant does not specifically claim otherwise, but it does seem clear that there was sufficient evidence to support giving Instruction 7.03. The testimony of Harrell, Terrell and the defendant indicate that Thompson could have prevented Waters from beating the defendant. Waters accused the defendant of stealing a coat from the pool room. The defendant claims that Thompson led him to believe that the coat was his (Thompson's) and that when the defendant found out otherwise, he brought the coat back to the pool room. The testimony indicates that Thompson refused to explain the situation to Waters and that Waters then severely beat the defendant. This is sufficient evidence to submit to the jury that the defendant may have been seriously provoked by the

deceased and that he may have acted under a sudden and intense passion resulting from that provocation. It is also relevant that the defendant testified that the deceased had struck him with a pool stick while he was being beaten by Waters.

The trial court did not err by giving Instruction 7.03 and in failing to give 7.05.

The judgment is affirmed.

G. MORAN, P. J., and CREBS, J., concur.