(No. 33395.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DANIEL L. SHIELDS *et al.*, Plaintiffs in Error.

*Opinion filed June 16, 1955.*

IRWIN S. RUBELLE, and EUGENE M. PRATT, both of Peoria, for plaintiffs in error.

LATHAM CASTLE, Attorney General, of Springfield, and JAMES P. KELLSTEDT, State's Attorney, of Peoria, (FRED G. LEACH, and GEORGE W. SCHWANER, JR., of counsel,) for the People.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

Plaintiffs in error (Daniel L. Shields and Robert Louis Stevenson) prosecute this writ of error to review their convictions in the circuit court of Peoria County of assault with intent to murder one Allen Gaskins. They were tried jointly before a jury and found guilty. Defendant Shields was sentenced to the penitentiary for a term of not less than four nor more than eight years, and defendant Stevenson received a sentence of not less than two nor more than four years in the penitentiary.

As to each defendant it is claimed the evidence is insufficient to sustain a conviction for the crime charged, assault with intent to murder. (Ill. Rev. Stat. 1953, chap. 38, pars. 58, 59.) Defendants also contend the prosecutor made improper argument to the jury.

The alleged assault forming the basis of this prosecution occurred in Peoria, Illinois, on June 20, 1953, in a park or playground which is adjacent to a housing development known as Warner Homes. On that date, at around 9 or 10 o'clock at night, Allen Gaskins, a man of slight build and around fifty years old, was seated alone on a bench in the park. The defendants drove to a nearby parking area, alighted from their car, and walked into the park. In so doing, they passed near the bench where Gaskins was sitting. What happened thereafter is disputed.

Gaskins testified that the defendants, whom he judged to be between nineteen and twenty years old, came around the bench "right around in front of me." He said he watched them from the time they got out of the car, and when they came to where he was, defendant Shields asked him what he was looking at. Just about that time, while he was still seated on the bench and before he said anything, Shields struck him a "lick." He did not remember anything that happened after that until he heard someone ask him to what hospital he wanted to go.

Catherine Martin, who also testified for the State, said that while she was standing on the porch of her home (a distance estimated by her as two hundred feet from where Gaskins was seated) she saw two boys, whom she identified as the defendants, come up to the bench. She said that the dark-haired one (defendant Shields) knocked Gaskins down and while he was on the ground kicked him. She testified that she could not hear any conversation between any of the parties, and by the time she got to where Gaskins was the defendants had gone.

Chester Perrilles, another eye witness who was called by the State, said he saw the assault while seated in his car which was parked about fifteen to twenty feet from the bench where Gaskins was sitting. This witness was acquainted with both defendants. He said they walked about three feet past Gaskins and stopped. Shields asked Gaskins what he had said, but the witness did not know whether Gaskins made any reply. Then Shields began hitting Gaskins with his fists, striking him five or six times according to Perrilles. Gaskins fell to the ground and Shields kicked him. Stevenson, who was standing a couple of feet away, then came up to Shields and said: "Come on; leave him alone; he has had enough; let's get out of here." As the defendants were leaving, Shields threatened Perilles, saying: "You seen it; don't say nothing or you will get the same thing."

Defendant Shields, testifying in his own behalf, related the following: He and Stevenson were on their way to the playground, and when they passed Gaskins the latter said something to them. Shields then turned and asked him what he had said. Gaskins "cussed" him and complained of how kids had been coming to the park and raising heck. Shields said he believed he had as much right there as he did. Then Gaskins asked, "You are not going?" and after Shields said he wasn't, Gaskins slapped him in the face. At this Shields hit him with his fists three or four times, which

spun Gaskins around so that he fell on the side of his face on the concrete. He did not kick him at any time. Then Stevenson "kind of got me and said 'Come on. I believe we had better go.'" The two of them walked away. As they passed Chester Perrilles' car, the latter asked what happened, and Shields answered: "Me and this man had a misunderstanding." Whereupon, Perrilles said "Oh," and that was all that was said between them. When asked why he hit Gaskins (whom he believed to be about fifty years old) so hard, Shields answered: "Me and him was arguing and I don't know, I guess I got mad; you know, he hit me so I hit him; it made me mad; I didn't mean to hurt him; I didn't try to kill him or anything; he hit me and I hit him back; it was just a fight."

Defendant Stevenson's version of the incident was as follows: As they walked past Gaskins, the latter mumbled something. He did not pay any attention to it but Shields stopped and asked Gaskins what he had said. This started an argument. He (Stevenson) kept walking, and when he was about fifteen feet from the other two, he heard them "cussing" each other and turned around. Gaskins was then seated on the bench. But he got up and there was a fight, which lasted "about ten or fifteen seconds." But he could not say whether Gaskins was knocked down or whether he slipped, and he did not know whether Shields actually hit Gaskins or not. He said, "It happened so quick I didn't know what to do." After Gaskins was on the ground, Stevenson told Shields "Let's go," and they walked away, got in the car and left.

These were the only witnesses who testified to the assault as such. However, the State produced other evidence. There was considerable medical testimony as to the extent of the injuries and the treatment given. It was pointed out that the injuries to Gaskins were very severe. The bones of his face were fractured loose from that part of the skull which holds the brain, and he spent three weeks

in the hospital. The treatment consisted of attaching.appliances to hold these bones back up against the skull so they could heal in proper position. No evidence was offered, however, that Gaskins' life was ever in danger.

The police officers who arrested Shields said he told them that he (Shields) had his reasons for beating up Gaskins. Shields, however, said one of the officers said to him, "Danny, I have known you a long time, * * * I know if you did this you must have had a good reason for it." To which Shields replied, "That is right, if I did it."

Gaskins' wife testified that prior to the assault Gaskins was suffering from rheumatism but otherwise was normal. She said that when she saw him at the hospital the night of the assault, his face was swelled so large she did not recognize him and there was blood around his nose and a cut down his cheek. Two other witnesses, who came upon the scene after the defendants left, also testified.

We shall consider first whether the evidence is sufficient to support the conviction of defendant Shields.

Specific intent to take life is the gist of the offense of assault with intent to murder and must be proved beyond a reasonable doubt. However, it has been recognized that specific or express proof of the intent is not necessary (such as statements or declarations of the accused), but it may be inferred from the character, manner and circumstances of the assault. (*People* v. *Bashic,* 306 Ill. 341; *People* v. *Herbert,* 340 Ill. 320; *Crosby* v. *People,* 137 Ill. 325.) This follows from the fact that "Every sane man is presumed to intend all of the natural and probable consequences flowing from his own deliberate act. Therefore, if one voluntarily and willfully does an act the direct and natural tendency of which is to destroy another's life, the natural and irresistible conclusion, in the absence of qualifying facts, is, that the destruction of such other person's life was intended." *Weaver* v. *People,* 132 Ill. 536, 540-1.

The facts in this case disclose beyond all reasonable doubt that defendant Shields made a vicious assault upon Gaskins and thereby inflicted upon him very serious personal injuries. Moreover, it is apparent that Shields had no justification whatever in so acting and must have been actuated by that wanton and reckless disregard of human life that denotes malice. We have stated many times that it is not requisite or necessary that an accused should have brooded over the intent or entertained it for any considerable time. Rather, it is sufficient if, at the instant of the assault, he intended to kill the party assaulted; or it will be enough if he is actuated in making the assault by that wanton and reckless disregard of human life that denotes malice, and the assault is made under such circumstances that if death had ensued the killing would have been murder. *People* v. *Marrow,* 403 Ill. 69, 75; *Weaver* v. *People,* 132 Ill. 536, 540.

It is true that Shields did not employ a weapon of a conventional type in the assault, but this, of itself, does not preclude a conviction for assault with intent to murder. (*Crosby* v. *People,* 137 Ill. 325.) Where one voluntarily and willfully does an act, the natural tendency of which is to destroy another's life, in the absence of qualifying facts, it must be presumed the destruction of the other's life was intended. (*People* v. *Marrow,* 403 Ill. 69; *People* v. *Henderson,* 398 Ill. 348; *Koser* v. *People,* 224 Ill. 201.) In view of the absence of any considerable provocation, the disparity of age and physical strength between the defendant and his victim, the lack of any resistance being offered by the victim, the extreme seriousness of the injuries inflicted, the kicking of the victim after he had fallen to the ground, and the circumstances indicating the defendant's complete and reckless disregard of social duty, we cannot say that the evidence is so palpably contrary to the jury's verdict or so unreasonable, improbable, or unsatisfactory

as to justify our entertaining reasonable doubt of defendant Shields' guilt.

It was also urged that the court committed reversible error in overruling objection to the following argument which the prosecutor made to the jury: "I ask you this question, if Allen Gaskins had died—which very well could have happened from that attack—would it be murder or would it be a police court matter?" Counsel for the defendant Shields concedes that had there been any proof of an intent to kill and murder, the argument would have been proper, since the direct test of guilt of the charge is whether if the victim had died it would have been murder. But he argues that there was a complete absence of any evidence on which a jury could possibly predicate such a finding. As we have pointed out, there was such proof of malice on the part of defendant Shields that had Gaskins died he would have been guilty of murder. Therefore, this remark by the prosecutor, in the form of a question, could not under the circumstances have reasonably misled the jury.

As to defendant Stevenson, however, there is a total absence of proof to sustain a conviction of assault with intent to murder. It is uncontradicted that Stevenson did not strike any blow whatever, nor did he encourage Shields to do so. There is no evidence implicating him in the assault, and mere presence at the commission of an alleged offense, without any affirmative act of assisting, abetting or encouraging the commission of the act, is not sufficient to make one a principal in the commission of the offense. *People* v. *Barnes*, 311 Ill. 559; *People* v. *Richie*, 317 Ill. 551; *People* v. *Mutter*, 378 Ill. 216.

The conviction of defendant Shields is affirmed, and the conviction of defendant Stevenson is reversed.

*Affirmed as to Shields, reversed as to Stevenson.*