(No. 33815.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HOLLEN HAWES, Plaintiff in Error.

*Opinion filed May 23, 1956.*

George W. Kasserman, Jr., of Newton, for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and J. A. Eaton, State's Attorney, of Newton, (Fred G. Leach, Edwin A. Strugala, and Norma Eaton, of counsel,) for the People.

Mr. Justice Maxwell delivered the opinion of the court:

Plaintiff in error, Hollen Hawes, was convicted by a jury in the circuit court of Jasper County of the crime of assault with intent to murder and was sentenced to a term of not less than eighteen months and not more than three years in the penitentiary. He brings writ of error to review that conviction.

The charge grew out of a fracas in which plaintiff in error, whom we shall refer to as defendant, stabbed his estranged wife in the abdomen with a pocket knife. The wife and the fourteen-year-old son of the parties, testifying for the State, and defendant, testifying in his own behalf, tell conflicting stories about the final encounter but some of the preceding circumstances are uncontradicted. Defendant and his wife had been married about fifteen years at the time of the offense charged on October 11, 1954. Although they then had four children, aged fourteen, ten, eight, and three years, their matrimonial sea had been a turbulent affair, according to defendant's testimony, from the date of their marriage. One of defendant's witnesses testified: "Yes, I have lived near these people for quite a while and as to whether there has been any trouble before, it was just like tying a cat and dog over a clothesline." There had been separations and reconciliations, each

of the parties had at one time filed for divorce, but as defendant stated neither case "paid no dividends." According to the wife's testimony, their marital difficulties were attributable to his excessive drinking and distrust of her. He offered no explanation.

Defendant and his wife had lived separate and apart for about a year before October 11, 1954. He was then residing with his sister and brother-in-law at Mattoon and she, with the four children, was residing in a home she had rented in the village of Willow Hill. In November of 1953 defendant had gone to his wife's home with a shotgun, and when she ran to a neighbor's home he followed with the gun. When told by the neighbor that she was going to call the sheriff, defendant tore the telephone from the wall. The sheriff testified that he had been called by defendant's wife on other occasions when defendant was drunk and was "disturbing the peace," that he was called at the time that defendant had the shotgun but "They had taken the shotgun away from him when I got there and he was arrested for tearing a telephone off the wall." He also testified that on the same occasion he went to her home and took a butcher knife out of defendant's pocket. The defendant said he had the shotgun because he had been hunting, and had the butcher knife because he intended to eat a cool lunch out of the refrigerator and put the butcher knife in his pocket when the sheriff came over. Three nights before October 11, defendant had gone to his wife's home and she refused to let him in because he had been drinking. She testified he said he was coming back and the next time he would get in. The son, Charles, testified that on that occasion he threatened to "cut her head off." Defendant did not refer to this occasion in his testimony. Both defendant and his wife testified that on another occasion she had thrown a bucket of cold water on him.

On the evening of the stabbing, defendant arrived at his wife's home about 7:30 P.M. He stated that he went

there because he had been told that she wanted to see him about taking care of the children while she went to Indiana with her mother. Defendant's wife admitted that she had talked with her mother about this and defendant's story was verified by his mother-in-law and other witnesses. Defendant's version of what happened, as his testimony appears in the record, is as follows:

"A. Well, I went down there on the 11th. I imagine it was in the neighborhood of 7:30 and I came through the breeze-way there or whatever you call it into the back yard and my wife and the boy, the older boy, was out there at the clothesline. I don't know whether she was taking clothes off or on the line. Actually I never noticed. I went down there with the idea to make preparations to take care of the children while she went to her sister's. She said I caused her to lose the mother's pension. I turned around and started to walk away. I got between an out-building and a porch which had an awning on it and the bicycle— I hollered and said to Chuckie, I asked if the bicycle was still working, and didn't get an answer and I went through the part screen door and part wood door into the porch and there is where the accident happened. She grabbed me * * * right there and my boy struck me from over her head with a chunk of wood that took both hands to raise. Then I stuck her with the knife. I admit I did."

Defendant further testified that he was afraid they were going to hurt him and that he believed they would have beaten him to death if he would have stayed there.

The wife's version, summarized from her testimony was that she was in the house ironing when he knocked at the door; that she went to the door and he said he had talked with her mother about his keeping the children; that she told him she had decided not to go to Indiana; that he wanted to come in and she refused; that he argued about it and got mad; that she shut the door and went about her ironing thinking he had gone; she called Chuckie

to come in from the yard, he came in and said his father had sent him in to call her some bad names; that she asked him where his father was and he said "I guess he went on home." She stated she went to lock the screen door and the defendant was standing there; another argument started, he called her names, said she wasn't fit to have the kids, he was going to take them away from her, she kept telling him to leave, he accused her of throwing water on him and she said she would do it again if he didn't leave and he then said "Hot lead will stop you." "I was trying to get the screen door locked and he got hold of the door and he had hold of me. I thought he was going to hit me in the face but he didn't hit me, he cut me and I saw it. He grabbed me and was trying to pull me through the door. After he stabbed me Chuckie said 'Daddy, don't stab her' and he said 'I'll cut her head off.' I seen him stumble and the first I thought of was that he had stepped on that blood and stumbled, but Chuckie had hit him. That is all I know. I went back through the house and tried to get out the bedroom door—Hol was behind me. I don't remember after that. I remember coming to Madden's, and I remember going to Madden's. I don't remember going to the hospital." She further testified that there were two cuts on her hand but she didn't know how they got there.

Charles, or Chuckie, testified his mother and father were arguing at the door, calling one another names; she told him to go home and he heard him say "hot lead would stop her." "He grabbed hold of Mom's shoulder. My mother didn't have anything in her hands at the time. I don't know whether my father had anything in his hands at the time. He was out in the dark and I couldn't see. He just started to raise up his hand—I don't know what he was going to do. I heard him open the knife. I never did see the knife in his hand—I didn't see anything. I saw the blood start pouring out, she was standing beside me and started to go back to the house. After that, I hit him with a stick of

wood. After I hit Dad, he started to fall down. It was a stick of wood we used for firewood. After I did that I went over to Maddens. We just told them what happened and they told us to go to their neighbors and get him and I went over there. I didn't see my mother hit my father at any time when they were at the door. The only time I ever heard my father threaten my mother was one Friday night when he came in and he said he would cut her head off. It was on that Friday night she was talking about." Both the wife and son testified the defendant had been drinking, and he stated that he had been drinking "to some extent."

All three of them went to the home of the neighbor Madden who called an ambulance and the sheriff. She was taken to the hospital and he was taken into custody by the sheriff. The doctor who examined Mrs. Hawes at the hospital stated that she was in shock, suffering from a wound in the region of the solar plexus diaphragm which he thought was about an inch deep, maybe a half inch. He stated it was difficult to say whether it could have caused death but he believed it could have from loss of blood.

On this evidence the jury found the defendant guilty of assault with intent to murder. The defendant contends first that the evidence was insufficient to support a verdict of guilty of assault with intent to commit murder. He argues that the circumstances that he was armed only with a pocket knife and that he could have but did not continue the assault show that the assault was committed in self defense and not with an intent to commit murder. The argument that defendant was armed only with a pocket knife bears no weight. It cannot be contended that a mortal wound could not be inflicted with that kind of a weapon, and if the necessary elements of an assault with intent to murder are present the kind of weapon employed is not material. (*People* v. *Shields*, 6 Ill.2d 200.) Nor are we impressed by the argument that his failure to stab his wife a second

time shows a lack of intent to commit murder. His failure to stab her the second time can as well be attributed to the fact that he was struck over the head with a piece of stove wood as to a lack of intent to commit murder.

The uncontradicted evidence shows defendant had previously threatened his wife, had followed her with a shotgun, and during one of their arguments had been found with a butcher knife in his pocket. On the occasion of this offense he had been drinking, was told to leave and did start to go away, then for some reason which he failed to explain he returned to resume the argument. If the testimony of the wife and son is believed, which the jury had a perfect right to do, the assault of the defendant upon his wife with a deadly weapon was wholly unprovoked and showed a wanton and reckless disregard for her life actuated by malice. We cannot say this evidence is so palpably contrary to the jury's verdict that that verdict should be set aside. *People* v. *Shields,* 6 Ill.2d 200.

Defendant further contends that the court failed to properly instruct the jury as to his defense of self-defense. The court gave the following instruction tendered by the People:

"The court instructs the jury that if they believe beyond a reasonable doubt from the evidence that the defendant thrust a knife into the body of Fern Hawes as charged in the indictment with malice aforethought or with a reckless and total disregard of human life, and not in self defense as defined by these instructions and that the use of said weapon, as used by the defendant, if he did use it as aforesaid, was likely to kill the said Fern Hawes, then the said defendant may be found guilty of an assault with intent to commit murder."

The only instruction given which referred to self-defense was tendered by defendant, as follows:

"The Court instructs the jury, that the law of self-defense is a good and legal defense and is the law of the

land, and if, after carefully considering all the testimony in this case, the jury believe from the evidence that the defendant upon the occasion in question acted as an ordinary reasonable man would have acted under the same or like circumstances, it is their duty to return a verdict of not guilty on the ground of self-defense."

The defendant argues that these two instructions do not define the elements of self-defense and that the People's instruction advises the jury that they are to be the judge of whether or not the defendant's act was committed in self-defense, thereby ignoring the rule that what the defendant believed as to whether or not he was in danger or such apparent danger as required the means taken for his protection, rather than what the jury believes, is the test of self-defense.

It is certainly true that defendant's instruction fails to define the elements of self-defense. But he cannot complain of the defects contained in his own instructions. (*People* v. *Lynn*, 387 Ill. 549.) The only other instructions tendered by the defendant defining the elements of self-defense were as follows:

"The court instructs the jury, as a matter of law, that if a person while he is in a place where he has a lawful right to be is unlawfully assaulted and in apparent danger of his life or great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force even to taking the assailant's life."

"The Court instructs the jury, as a matter of law, that a person attacked may stand his ground and repel force with force to the extent of taking his assailant's life if necessary in order to preserve his own or to protect himself from great bodily harm."

These instructions were refused by the court and we think properly so. The first assumes that defendant was in a place where he had a lawful right to be, the second assumes that defendant was attacked. The evidence in this

case does not permit of either of these assumptions. If, as a result of the court's refusal to give these two instructions and the defects of the defendant's given instruction on self-defense, the court did not properly instruct the jury on defendant's defense, he should have tendered a proper instruction for this purpose. The court was not required to give instructions upon its own motion. *People* v. *Lindsay*, 412 Ill. 472; *People* v. *Wilson*, 1 Ill.2d 178.

Defendant contends that the People's instruction here is similar to the condemned instruction in *People* v. *Edwards*, 389 Ill. 563. There the jury was instructed "and if you further believe from the evidence beyond a reasonable doubt that such assault was not in the necessary defense of the said Homer S. Edwards * * *." This court held this instruction improperly advised the jury that the defendant should be convicted *if the jury believed* defendant's act was not committed in self-defense. The instruction given in the instant case does not advise the jury that defendant should be convicted if the jury believes his act was not committed in self-defense. It advises them that the defendant should be convicted if his act was "not in self-defense as defined by these instructions * * *." Defendant's instruction then advised the jury that "if, after carefully considering all the testimony in this case, the jury believe from the evidence that the defendant upon the occasion in question acted as an ordinary reasonable man would have acted under the same or like circumstances, it is their duty to return a verdict of not guilty on the ground of self-defense." If the People's instruction was bad it was made so by defendant's instruction, and defendant is in no position to complain of such error. (*People* v. *Beil*, 322 Ill. 434; *People* v. *Phipps*, 268 Ill. 210.) We agree with defendant's argument that the jury was not properly instructed as to the law of self-defense, but this error is attributable to the defendant's failure to present a proper instruction as well as to the People's neglect to present an

instruction defining self-defense as their given instruction had anticipated.

The object of review in a criminal case is not to determine whether the record is free from error but whether a just verdict has been rendered, upon sufficient competent evidence, after a trial in which no error prejudicial to defendant's rights has occurred. (*People* v. *Booker,* 378 Ill. 334.) In the instant case the jury's verdict was amply justified by the evidence and it was not the result of any prejudicial error.

The judgment of the circuit court of Jasper County is affirmed.

*Judgment affirmed.*