**People of the State of Illinois, Plaintiff-Appellee, v. Hubert Patrick Skidmore, Defendant-Appellant.**

**Gen. No. 50,913.**

First District, First Division.

April 11, 1966.

Rehearing denied May 2, 1966.

Thomas J. O'Brien and Cooney and Stenn, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE KLUCZYNSKI delivered the opinion of the court.

Defendant, Hubert Patrick Skidmore, was indicted for murder and found guilty of the lesser included crime of involuntary manslaughter in a trial by jury. He was sentenced to a term of five to ten years.

On appeal, defendant contends that the trial judge erred in admitting into evidence and permitting the jurors to view certain photographs depicting the body of the deceased and the surrounding area in which it was found. He claims the photographs had no probative value, were prejudicial, and, at most, constituted cumulative evidence.

Defendant further contends that the trial judge erred in admitting into evidence incriminating statements made by the defendant to police officers and to an Assistant State's Attorney under circumstances where the accused was not afforded a right to retain counsel, nor warned of his constitutional right to remain silent. Thus his rights under the Sixth, Seventh and Fourteenth Amendments to the federal Constitution were violated.

Defendant finally contends that the court erred in giving an instruction tendered by the state which referred to certain statements the defendant made as confessions when, defendant urges, they were merely incriminating statements and not confessions.

Testifying in his own behalf, defendant said that on April 6, 1962, he left his place of employment about 8:00 a. m. and after visiting several taverns went home. At about 6:00 p. m., he had dinner in a restaurant and then went on a tour of taverns. At approximately 9:00 or 9:30 p. m., he entered the Random Lounge in the area of 75th & Exchange Avenue, Chicago. He was in the Lounge around closing time and then went next door to Ray's Lounge. He said it was after 2:00 or 2:30 a. m. He met his brother there and continued drinking. He

485

then met the deceased, Maxine Lanzafame and left with her for her apartment at about 3:30 a. m. At the apartment they found a fifth of whisky and finished approximately half of it together. They put the radio on and danced. After necking a while on the sofa, deceased said, "If we are going to do anything, we'll go into the bedroom and do it properly and not here." After entering the bedroom, deceased went out and returned in the nude. They both got into bed and were hugging and kissing when, "before we could start anything, she started calling" him "a raper." He got out of bed, told her he was not a raper. She continued screaming and accusing him of being "nothing but a dirty rotten raper." He admitted hitting her with his left hand in the stomach. She fell on the bed "seat first," got up again and kept on screaming. He hit her "in the mouth and nose area." He dressed, and was about to leave, but found he couldn't leave her, "that is all." After he went back he looked at her. She was bleeding and there was blood on the floor. He removed his clothes again, got into the bathtub with the deceased and turned on the cold water to sober her up. After taking her back to the bed he applied wet cloths to her face and behind her neck. He placed some garments on her and fell asleep on the bedroom floor. When he awakened she "had this eye here open" and was looking at him and following him because he walked around the bed. He then applied some more wet cloths and told her not to say anything. Everything would be all right. She put her hand on the side of his face and said, "Oh Pat." When he left the apartment about 12:30 or 1:00 p. m., she was alive.

When asked on cross-examination how severe were the blows he inflicted upon the deceased, he answered: "I just swung." He said she never hit or threatened him with violence. When he left her apartment, her nostrils were filled with coagulated blood and she was

breathing heavily. Two of his right hand knuckles were skinned as a result of the blows.

Fred Lanzafame, the estranged husband of the deceased, discovered the body at approximately 2:30 p. m. on April 7, 1962. He found the living room in disarray and the nude body of his wife, covered with blood, lying on the bed. He shook her and when there was no response, turned the body over and "saw her face was all smashed up . . . . Her both eyes were swollen, quite big, in fact, to the proportion of her face, her nose was flat, almost level with her eyes, her lips were all swollen, blood was between her lips and on her teeth."

The police officer who responded to a radio call noticed that the deceased was "bruised about the face, the skin was a gray, bluish-gray in color" . . . "the lips were swollen, dried blood around the lips, the left eye was blue, black and blue. She had a laceration above the right eye and also one on the chin." Another officer stated he found a frying pan under a blanket on the floor to the right of the bed. The handle was broken off, the pan was dented in on the bottom and there was "a red colored substance, believed to be blood, on the bottom. . . . After the body was removed the handle was found between the mattress and innerspring on the bed."

A third officer who viewed the body at the scene, said: "I seen a small cut underneath the left side of the chin, a half inch laceration over the right eye and blood emitting from her nostrils and her lips." He took photographs which he identified at the trial and which the court admitted into evidence.

Defendant was arrested at home, taken to the police station where, after a short period of interrogation, started weeping and said "I did it. I killed her." He then gave the police a written statement and some two hours later gave another to an Assistant State's Attorney.

487

Defendant first argues that the trial court erred in admitting into evidence and in permitting the jurors to view the photographs of the victim's body and the bedroom area. The photographs were not in color yet did indicate the condition of the face and bruises on her body. They were admitted for the purpose of showing the amount of force used. In view of the defendant's story that he "just swung," striking her but twice, once in the face and again in the stomach, and because of the divergent description given by the victim's husband and the officers, it was helpful and of probative value when viewed by the jurors. In fact, we believe the admission of the photographs was to defendant's advantage as evidenced by the verdict rendered herein.

 Questions relating to the character of the evidence offered and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse resulting in prejudice to the defendant. People v. Jenko, 410 Ill 478, 482, 102 NE2d 783 (1952). The trial court, in our opinion, did not abuse that discretion and the defendant was not prejudiced thereby.

██ ██ Secondly, defendant objects to the fact that the court admitted the incriminating, signed statements given by the defendant to the police officers and the Assistant State's Attorney upon the grounds that constitutional privileges were violated because he was not afforded right to retain counsel, nor warned of his constitutional rights. Although these contentions, under the circumstances, may be disposed of under the rule enunciated in People v. Hartgraves, 31 Ill2d 375, 202 NE 2d 33 (1964) and those cases following it, we find defendant has no basis for this complaint in view of the fact that he himself took the witness stand and practically in detail reiterated under oath in the trial the matters contained in these written statements. He was, there-

fore, not prejudiced and cannot claim constitutional privileges which he voluntarily waived by testifying.

Finally, defendant urges reversal on the ground that the court erred in giving an instruction which referred to the written statements as confessions "when in fact they were not confessions but merely incriminating statements." The instruction was as follows:

> It is the duty of the jury to consider all the evidence which the court has admitted as competent for their consideration, and they have no right to disregard the evidence of any confession which the court has permitted them to hear. The jury are the exclusive judges of the credibility of the confession and the weight which should be given it as proof. They shall take into consideration all the circumstances in evidence in regard to the making of the confession in determining its truth or falsity. Whether the confession is true or false, or partly true and partly false, is a question for the jury to determine. It is for the jury to consider and weigh the confession and give it such credit as it may be entitled to in the judgment of the jury.

The reference in this instruction to "all" the evidence and "*any*" confession would include defendant's remark made shortly after his arrest: "I did it. I killed her." Taking defendant's testimony at the trial wherein he described his conduct regarding the incident almost exactly as given in his written statements, we hold such instruction could not have prejudiced him.

For these reasons it is our opinion that defendant had a fair trial, and the verdict and judgment justified. The judgment is affirmed.

Affirmed.

BURMAN and MURPHY, JJ., concur.