**The People of the State of Illinois, Plaintiff-Appellee, v. David L. Coddington, Defendant-Appellant.**

**Gen. No. 69–21.**

Fifth District.

April 28, 1970.

Robert Cummings, of Belleville, for appellant.

Robert H. Rice, State's Attorney of St. Clair County, of Belleville (Kenneth J. Juen, Assistant State's Attorney, of counsel), for appellee.

MORAN, P. J.

The defendant, David L. Coddington, hereinafter referred to as Coddington, was convicted of the murder of John A. Petermeyer, hereinafter referred to as Petermeyer, in a jury trial in the Circuit Court of St. Clair County, wherein the jury returned a verdict of death. The trial court denied defendant's motion for a new trial, and sentenced Coddington to a term of not less than 199 nor more than 200 years. Chapter 38, section 1–7, Ill Rev Stats. Coddington appeals.

The evidence shows that the victim, Petermeyer, was living in a house belonging to Coddington's mother at 3335 Vernier Avenue in Belleville, Illinois. Petermeyer had been acquainted with the Coddington family for over thirty years and had lived with them on several occasions. He had been living in the house with the permission of Mrs. Coddington for the purpose of maintaining the premises. Petermeyer was 78 years of age but was quite agile for his age and was able to maintain a garden and cut the grass, even though he walked with a slight limp due to a broken leg two years before.

On June 8, 1966, a niece of Petermeyer reported to the City Police of Belleville, Illinois, that he was missing. The police examined the premises on Vernier Avenue and found certain bloodstains. In the course of investigation the police talked to the next door neighbors, Mr. and Mrs. Pierce, who advised that they had not seen Peter-

meyer since the early part of April, 1966, but they had subsequently seen Coddington, and Mrs. Pierce had a conversation with Coddington in early May, 1966, at the mailbox in front of the house. A propane gas deliveryman delivered a bottle of gas on April 6, 1966, which was signed for by Petermeyer. The time of day of this delivery was not established.

The police determined to question Coddington and learned from his father-in-law, Leroy Daubach, that he had gone to Minnesota in an automobile, the title to which was registered in the name of the father-in-law. The police prevailed upon the father-in-law to prefer a charge against Coddington for auto theft as a means to have him brought back to Belleville for questioning, and on July 5, 1966, Coddington was arrested in Minnesota on the auto theft charge by a special agent of the F.B.I., who interrogated him concerning the whereabouts of Petermeyer.

Meanwhile, the Belleville police were continuing their investigation and Chief of Police Dobson interrogated a certain William McDaniel, a convicted felon on probation from a prior offense who became the key witness for the prosecution in the present case. McDaniel's testimony was that Coddington told him that he (Coddington) had killed Petermeyer and compelled McDaniel to assist him in disposing of the body through threats to the safety of McDaniel's wife and children. McDaniel led the police to an area known as Silver Creek in St. Clair County, where the body of Petermeyer was found on July 22, 1966.

Eventually Coddington was returned from Minnesota to St. Clair County, Illinois, in the custody of deputy sheriffs on November 18, 1966, and remained in the county jail until the morning of November 21, 1966, when he was transferred to the city jail of Belleville and, following a conversation with Chief Dobson, he made the following written statement on November 22, 1966:

355

"I, David L. Coddington, age 24 years, married, born in Belleville, Illinois, Occupation Medical Specialist, residing at 217 South 29th Street, Belleville, Illinois, have been advised by Chief Reese G. Dobson and Joseph Rodriguez that I have a right to remain silent and that I do not have to make any statement, answer any questions or talk to Chief Dobson and Mr. Rodriguez nor answer any questions directed to me; I have further been advised that anything I say, or any statement I give, can and will be introduced into evidence in Court against me, I have further been advised that if I want an attorney to be present at this time or anytime hereafter I am entitled to such attorney, and that if I cannot afford to pay for an attorney, that an attorney will be furnished to me if I so desire and that if I do desire an attorney I do not have to make any statement or answer any questions until such time as an attorney has consulted with me.

"Having been advised of these rights as above, I hereby agree to make a statement, to answer questions asked of me and I waive my right to have an attorney as above set forth. I further state that I have not been threatened or mistreated in any fashion nor have any promises . of leniency been made to me in return for making this statement.

"On Wednesday, April 6, 1966, I went to visit my sister, Mrs. Cheryl J. Milligan at 212 West Washington Street in Belleville, Illinois. In the course of this visit my sister ask me if I would take her to 3335 Vernier Ave. (a house owned by my mother and occupied by John A. Petermeyer), to get an electric frying pan (which our Mother had told her she could have) and some clothing which belonged to my sister. I agreed to take her to the house to get these items.

"We arrived at the house on Vernier Avenue at about 11:15 a. m. or 11:30 a. m. and were confronted

356

at the entrance of the house by John A. Petermeyer. At the begining, John Petermeyer started calling us names (mainly directed at my sister such as whore and little Bitch, he referred to me as a God damn ex-convict) and refused to admit us to the house. After a couple of minutes of arguing with John Petermeyer we (my sister and I) finally gained admittance to the house.

"When we entered the house the argueing continued with John Petermeyer. My sister took a seat in the kitchen next to the door entering the house, I took a seat at the opposite end of the kitchen table from my sister in a more or less lounge type chair. John Petermeyer took a seat to begin with in a kitchen chair between my sister and I.

"The arguement that was taking place between the three of us was the same as many arguements that had previously occured between John Petermeyer and I. The subject matter of these arguements were that John Petermeyer was not taking proper care of the interior of the house, he was drinking and becoming drunk which was against my Mother's wishes and in general allowing the house to depreciate a great deal.

"John Petermeyer alleged that We (my sister Cheryl, her husband George O. Milligan and myself) were in a plot to have him John Petermeyer removed from the house so that either my sister and her husband or my wife and I could move into the house. We tried to explain to him that none of us wanted the house for own personal use, but at the same time we did not wish to have him (John Petermeyer) allow the house to depreciate through neglect. We always told him that we did not wish to have him (John Petermeyer) removed from the house, but we would have him removed if he did not

stop his drinking and if he did not start taking better care of the house.

"On April 6, 1966, this is what the arguement was about. John Petermeyer kept saying that he was not going to let us tell him what to do and he wasn't going to allow himself to be removed so that my Whore of a sister and her rotten husband could move in, or that he would allow himself to be removed so a god damn ex-convict and his bitch wife could move in.

"As the arguement progressed John Petermeyer stood up and became steadily more enraged and more abusive in the nature of his language towards my sister and I.

"At the height of this arguement I got up and turning my back to John Petermeyer I started pouring a cup of coffee at the stove and at the same time telling him I was fed up with him and was going to write my mother to have John Petermeyer removed from the house. I had just set the coffee down and was about to go to the cabinet where the sugar was kept when my sister screamed 'David look out' I started to turn around when I was hit by John Petermeyer, a glancing blow with a hammer on the top rear of my head. The blow was not sufficient to render me unconscious but it did knock me down on the floor.

"After knocking me down John Petermeyer turned on my sister and said 'I'll get you too.' My sister started to retreat towards the living room of the house. I got to my feet and stopped Petermeyer at the archway leading from the kitchen to the living room. John Petermeyer and I became engaged in battle for the hammer and in this process he forced me back into the kitchen. At a point opposite of an Amana freezer in the kitchen I managed to get the hammer out of John Petermeyer's hand.

"When I got the hammer out of his hand he reached down on a cabinet and picked up a wooden handled butcher knife. We then were wrestling very hard and he told me 'I'm going to kill you.' While wrestling I broke his grip on my right hand in which I now had the hammer and side stepped him and he went past me. At this point his back was towards me and I struck him with the hammer and he fell to the floor in front of the kitchen sink.

"My blow was not hard enough to knock him out and he got back up with the knife in his hand and started advancing towards me again. I back away from him into the living room trying to reason with him to put the knife down. My sister stayed a distance behind me and eventually wound up in the back room where the washer, dryer and bath facilities are. When I reached the door to the room my sister had retreated into, John Petermeyer swung at me with the knife and I grabbed his wrist. I dropped the hammer from my hand to free my right hand in an effort to have both hands free to fight for the knife which John Petermeyer had. John Petermeyer forced me back against a portion of wall between the furnace and the door leading to the back room. I forced myself back off the wall placing my right foot behind Petermeyer, tripping him and causing us both to fall, with me on top of Petermeyer. It was at this point that I managed to get the knife from Petermeyer and I stabbed him twice in the chest. After stabbing him twice I threw the knife on a rug in front of the living room couch. Petermeyer continued to struggle and threw me or pushed me off of him and rolling over on his stomach he reached for the knife again. At this point I picked up the hammer from the floor and struck John Petermeyer with it twice on his head. The second blow completely penetrated his skull.

359

"I rolled him back over on his back and he only took a few breaths and stopped breathing. I checked him for heartbeat and found none. My sister came out of the back room and I told her that Petermeyer was dead. There was large pool of thick blood around his head, a small portion of blood had ran from his mouth and what I presume was a portion of his lung was sticking out of his chest.

"I took my sister out in the kitchen and she tried to get me to call Chief Dobson. But for reasons I will disclose at later time I did not do so.

"I then took my sister out to the car, got some of my clothes from the car and went back into the house and changed clothes. I took my blood spattered clothes, wrapped the hammer and knife in them, returned to the car and took my little sister back to her apartment on Washington Street. When I left her on this day I told her I would take care of everything and that she should say nothing about what had happened that day to anyone.

"After leaving my sister's apartment I drove to Nokomis, Illinois and contacted William McDaniels. I told McDaniels what had happened, except for the fact that my sister was there at the time. After talking everything over, McDaniels told me he would help me dispose of John Petermeyer's body for a sum of ($100) one hundred dollars. I told him I did not have that kind of money, but McDaniels told me he needed money and would not take any risk for less than One Hundred Dollars.

"I stayed that evening, April 6, 1966 in Nokomis, Illinois at McDaniels' girl friend's house, Donna Vanus. On the following day, April 7, 1966, I drove back to Belleville and returned to the house where John Petermeyer's body was.

"I entered the house and moved Petermeyer's body from the living room to the back room. I got a

lot of rags from the back bedroom, went into the living room and wiped up the large pool of blood. I then took a bucket of water and a mop and mopped the remainder of the blood from the floor.

"After doing this I gathered some wool blankets from around the house and went to Petermeyer's body. I removed his wallet and change purse from his pockets and more or less wrapped his body with the wool blankets.

"I went into the living room and removed the paper money from John Petermeyer's wallet. There was a little over ($50) fifty dollars in his wallet.

"I looked around the house and found his checkbook and last bank statement. From the bank statement I learned that his checking account contained about ($420.00) four hundred and twenty dollars. I took one of Petermeyer's cancelled checks and a fresh check and traced his signature on a check and made the check out for ($56) fifty-six dollars and payable to me. After making a final check of the house I left. I then went to the Belleville National Savings Bank in which Petermeyer had his account and cashed the check at the drive-in teller's window.

"From the bank I went to 217 South 29th Street and saw my wife and father-in-law. While at the house I removed the hammer and clothes from the car. I burned the clothes in the house in a stove. I washed the hammer off with a hose outside and put the hammer with my father-in-law's tools.

"I then took my wife to a laundra-mat on the south belt line to wash clothes. After this I returned my wife to the house on South 29th, gave my father-in-law $10 dollars for groceries and left, telling my wife and father-in-law I was going to Decatur, Illinois, to check on a job and I would be back on Monday or Tuesday, the 11th or 12th of April 1966.

"Before leaving Belleville I went to Auffenberg Ford and paid Mr. Lillis, in charge of the car rental service, for the use of the rented car I was driving and checked the car out again. The money for the car I had obtained the previous day, April 6, from William McDaniels.

"After leaving Auffenberg Ford Co. I proceeded towards Nokomis, Illinois. Somewhere up Route 66 I pulled down a side road and threw the butcher knife in some brush to the right side of the road.

"I then pulled back onto Route 66 and continued towards Nokomis, Illinois. As I drove up Route 66 I took Petermeyer's wallet and credentials and tore them into small pieces and threw them out the car window at intervals as I drove.

"When I arrived in Nokomis I paid McDaniels the $100 one hundred dollars he asked to help me. It was originally planned by McDaniels and I that we would return to Belleville that evening (April 7, 1966) to dispose of Petermeyer's body. However, it was not until April 8th that we left Nokomis at about midnight to return to Belleville.

"When we arrived in Belleville McDaniels refused to go to the house to help me get Petermeyer's body, so I took McDaniels to his home at 226 Portland Avenue, dropped him off and went to get Petermeyer's body by myself.

"When I got to the house where Petermeyer's body was, I got a red quilt to make a final wrapping for his body. I looked all over the house for some heavy twine or rope to tie the quilt with. I finally cut a piece of rope from the back bedroom to use. I wrapped Petermeyer's body in the red quilt and tied it up with the rope from the back bedroom. I also cut a piece of electrical cord from a fan in the utility room and tied this around Petermeyer's body.

"I then drug Petermeyer's body to the trunk of the car outside, but found I was unable to lift the body into the trunk. I went back into the house and got an ironing board. I took the cover off of the ironing board and took the ironing board outside. By using the ironing board I was able to lift the body into the trunk of the car.

"After getting the body in the trunk of the car, I went back into the house and mopped up the trail of blood caused by dragging the body across the floor, and then left. When I got to the road in front of the house (Vernier Ave.) I stopped the car and got two concrete blocks that were laying in the front yard. I placed these in the floor of the car. (They were to be used as weights on the body.) We originally planned to drive the body to a place in Chester, Illinois that McDaniels spoke of and drop the body in a river there.

"I then went back to McDaniel's house by way of Vernier Ave. to N. 28th Street to Gilbert to Illinois to Douglas to Portland Avenue.

"When I arrived at McDaniel's house I did not have a rope to attach the concrete blocks to the body with, so McDaniels cut a piece of plastic coated wire clothesline from the rear of the house he lived in.

"McDaniels said it was too dangerous to drive to Chester, but he knew another place which was as good. He said he would drive. We then went to the Silver Creek area where the body was found. The water was not very deep, so McDaniels said we could drag the body back in the woods and cover it with logs until we could return to dig a grave for the body. This is what we did. We placed the body where it was found apparently. I read this in the paper later on.

"After covering the body we went back to the car, took the concrete blocks, clothesline and some

blood-soaked rags and threw them in the Silver Creek. We then left and returned to Nokomis, Illinois.

"Yesterday November 21, 1966, at approximately 2 p. m., I accompanied Officers of the Belleville Police Department, namely Chief Dobson and Captain Paul Klincar to the home of my father-in-law at 217 South 29th Street, this city, where from a toolbox in the living room at this address I removed a claw hammer with a worn red-stained wooden handle and a red plastic insert in the top of the hammer and turned it over to the Officers, and I positively identify this hammer as the hammer I used to kill John Petermeyer as explained above.

"I have been shown this date at the Belleville Police Department by Chief of Police Reese G. Dobson and Chief Deputy Sheriff Joseph Rodriguez of the St. Clair County Sheriff's Department, photographs of a bundle which apparently contained a human body because I can see the feet sticking out at the end of the bundle, in what appears to be a red cloth or blanket with a blue colored cloth at one end of the bundle and I positively identify this as being the blanket which I wrapped John Petermeyer's body in which was blue on one side and red on the other. I positively identify this bundle apparently containing the body of John Petermeyer as the bundle McDaniels and I placed in the Silver Creek bottom woods as explained above by the rope and rubber covered electrical cord which I used to tie up John Petermeyer's body on the night of April 8, 1966. At the request of the above officers I have signed my name, the date and the time on the back of the two colored photographs which I used to identify the bundle.

"I have read this statement consisting of four pages and have made one correction and it is true."

364

Coddington's sister, Mrs. Cheryl Milligan, testified that on April 6, 1966, Coddington picked her up at her apartment at approximately 11:15 or 11:30 a. m. and they drove to the house on Vernier to pick up an electric frypan and the rest of her clothes. She had asked her brother to drive her there. Her testimony of the following events is the same as that of Coddington. She testified that all of the acts occurred very quickly and that Petermeyer had struck the first blow; that she saw Coddington stab Petermeyer before he threw the knife away on the rug; that on April 6 Coddington was not wearing a mask, nor was anyone else wearing a mask while they were present at the house. There was never any discussion by her or Coddington with respect to killing Petermeyer. She did not know whether Petermeyer had a bank account, nor did Coddington ask her whether he did. She never saw Coddington take any money from Petermeyer's pockets, nor did she ever see him write any checks in Petermeyer's name.

On cross-examination she admitted visting Coddington every week in jail and she admitted reading his written statement on several occasions. The prosecutor pointed out the similarity of the wording of her version of the story with that of the wording of Coddington's statement, noting particularly the phrases, "there was a large pool of thick blood around his head, a small portion of blood had ran from his mouth and what I presumed was a portion of his lung was sticking out of his chest. I dropped the hammer from my hand to free my right hand in an effort to have both hands free to fight for the knife." She described Petermeyer as being five feet, six inches, or five feet, seven inches tall and approximately 180 pounds.

McDaniel testified that Coddington had not mentioned anything about his sister being at the house at the time the killing took place, nor did he mention having struggled with Petermeyer or say anything about the killing

365

being in self-defense, nor did he say anything about himself being hit on the head with a hammer or complain about any headaches or other injury to his head. McDaniel had not noticed any blood on Coddington's head.

Coddington's testimony with respect to these events is substantially the same as in his statement, but in addition he testified that subsequent demands for money were made by McDaniel and because of these demands it was necessary to forge additional checks in a total amount of $600, of which $490 was given to McDaniel for "blackmail and burial fees." He denied making any threats concerning McDaniel's wife and children or to McDaniel, himself. He further denied that he had told McDaniel anything about wearing a mask at the time of the killing and he testified that he told McDaniel that he had killed Petermeyer in self-defense.

McDaniel also testified that Coddington's story was that he was in the house, that the old man walked in and unmasked him or snatched or grabbed for his mask and recognized him and Coddington hit him with a hammer and stabbed him. McDaniel does not remember exactly what else was said, but he knows that Coddington said, "It was horrible, because the old man just didn't want to die. He wouldn't give up." He knows that Coddington said that he had stabbed Petermeyer and that he (Coddington) had been wearing a mask, but did not know how many times he had stabbed Petermeyer or what kind of mask Coddington had been wearing or where the mask was. McDaniel remembers seeing blood on the defendant's socks, but not on any other part of his clothing.

There was character testimony on behalf of Coddington that Petermeyer had a reputation in the community for being violent and vicious. There was rebuttal testimony by the prosecution that Petermeyer was a peaceful and law-abiding citizen.

Coddington first argues that the trial court improperly denied his motion for change of venue to another court.

His motion alleged that an article appeared on the front page of the Belleville Daily News Democrat on November 19, 1966, which stated that he had an automobile in his possession which was owned by John Petermeyer, and leads the reader to believe that he stole the automobile from deceased. His motion further alleged that he was never in possession of an automobile owned by John Petermeyer and that because of the general circulation of this newspaper in St. Clair County, it would be impossible to select a jury which has not read this article. A copy of the article was attached to the motion but there were no supporting affidavits.

The state filed a motion in opposition to Coddington's motion alleging that there were no grounds alleged in his motion showing prejudice on the part of the inhabitants of the county and that the defendant's motion was not properly supported by affidavits. The state attached 26 affidavits of inhabitants of St. Clair County to the effect that they had no knowledge of this homicide or if they did have such knowledge, they had not formed an opinion as to Coddington's guilt and they felt he could get a fair trial in St. Clair County.

Coddington admits that his motion does not meet the requirements of Ill Rev Stats (1967), c 38, § 114–6, since it is not supported by affidavits which state facts showing the nature of the prejudice alleged.

 The accused is entitled to a change of venue when it appears there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is a reasonable apprehension that he cannot receive a fair and impartial trial. People v. Berry, 37 Ill2d 329, 226 NE2d 591. Each case must be decided on its own facts and the decision rests in the sound discretion of the trial court subject to review in cases of abuse. People v. Allen, 413 Ill 69, 107 NE2d 826. This case is easily distinguishable from Irvin v. Dowd, 366 US 717, and Rideau v. Louisiana, 373 US

723, cited by defendant, where "massive, pervasive and prejudicial publicity" aroused clearly demonstrated prejudice in the community, People v. Berry, supra, and on this showing we cannot say that the trial court abused its discretion in denying Coddington's motion.

Coddington next contends that his exculpatory statement was improperly admitted into evidence. He admits that he was given warnings required by Miranda v. Arizona, 384 US 436, however, he asserts he was tricked and cajoled by Chief Dobson into the waiver of his rights, thus destroying the voluntary character of his statement. Relying primarily on the statement in Miranda that "moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege," Coddington argues that the interrogation conducted by Chief Dobson thwarted the spirit and whole purpose of the Miranda decision. He points to evidence that Chief Dobson knew him and his family for several years and had helped him in the past when he was in trouble. Chief Dobson knew that Coddington trusted him as a friend. He speculates that the City of Belleville Police Department maintained control of this investigation instead of the St. Clair County Sheriff's office because Chief Dobson knew him and knew that he could get through to him where others might fail. He argues that Chief Dobson took him into his office and received him as a friend in that the initial conversation, which, according to the testimony, lasted anywhere from thirty seconds to fifteen minutes before the Miranda warnings were given to him. It was merely a softening up process designed to inspire Coddington's confidence in the Chief, so notwithstanding the warnings, he did not speak in the unfettered exercise of his own free will. Coddington also points to certain remarks which may have been made by Chief Dobson that, "you are in trouble son, and you need help," that he could be sent to the electric chair and that

"I want to help you get straightened out, but you must tell the truth."

A pretrial hearing on Coddington's motion to suppress the statements was held and the trial court determined that the statements were voluntarily given by Coddington. All of the witnesses present on November 21 and 22 during defendant's interrogation testified at this hearing that Coddington was properly admonished of his rights pursuant to the Miranda decision, that they believed Coddington fully understood the meaning of these warnings and that no threats or coercion were used to induce him to waive his rights and give a statement.

■■■■ Although the state has the burden of proving the voluntariness of the accused's statement by a preponderance of the evidence, it is clear that the trial court need not be convinced beyond a reasonable doubt. People v. Jackson, 41 Ill2d 102, 242 NE2d 160. It is also well settled that on review the trial court's determination will not be disturbed unless it is shown to be contrary to the manifest weight of the evidence. People v. Hudson, 38 Ill2d 616, 233 NE2d 403; People v. Hall, 38 Ill2d 308, 231 NE2d 416; People v. Spencer, 27 Ill2d 320, 189 NE2d 270. After reviewing the record in this case, we have found substantial evidence to support the trial court's finding that Coddington's statements were given voluntarily and that he had knowingly and intelligently waived his privilege. He repeatedly told Dobson and Officer Rodriguez that he was aware of his rights and that he wanted to make a statement. He testified that no threats or promises of leniency were ever made to him, nor was he mistreated in any way. His oral and written statements were given shortly after he signed the waiver of his rights and were not a product of any prolonged interrogation. He did testify that he felt by signing the statement he had written, he would be exonerated from the crime charged. An improper inducement which will negate the voluntariness of a confession must be ex-

ternal, that is, the motive of hope or fear must be directly applied by a third person and must not arise merely from the operation of the defendant's mind. 29 Am Jur2d, Evidence, § 543. The conclusion that Coddington's decision to give a statement was motivated by his own hope of exoneration under the circumstances and not from inducements directly made by the police is substantiated by a letter written by Coddington to Chief Dobson in October, 1966, from St. Paul, Minnesota, wherein he wrote that if he talked to any police officer, Chief Dobson would be the man he would want to talk to, with the stipulation that he would have to talk with his lawyer first. There had been no other communication between Coddington and Chief Dobson.

██ In any event, Coddington testified in his own behalf that the contents of his oral and written statements as given on November 21 and 22, 1966, were true and he reiterated these events in detail. He was, therefore, not prejudiced and should not be heard to claim constitutional privileges which he voluntarily waived by testifying. People v. Skidmore, 69 Ill App2d 483, 217 NE2d 431

██ Coddington also contends that in closing argument the prosecutor misstated certain evidence and used inflammatory language so as to deprive him of a fair trial. After studying the record in this case, particularly the statements asserted by Coddington as prejudicial, we cannot say that these remarks were not proper inferences to be drawn from the evidence, or were so prejudicial as to warrant granting a new trial, especially in view of the fact that no objection was made by defense counsel during the closing argument. People v. Donald, 29 Ill2d 283, 194 NE2d 227; People v. Sinclair, 27 Ill2d 505, 190 NE2d 298; People v. Johnson, 93 Ill App2d 184, 236 NE2d 338.

Since we have determined that the prosecutor's conduct was not so prejudicial as to necessitate a new trial,

it is unnecessary to consider the contention that the trial court erred in failing to stop the prosecutor's argument.

■■■■ He further contends that the trial court erred in failing to give an instruction regarding the testimony of an accomplice. No such instruction was either tendered by defense counsel or rejected by the trial court. An instruction on accomplice testimony would have been proper if the witness McDaniel was an accomplice, but in our judgment he was not. The generally accepted test as to whether a witness is an accomplice is whether he, himself, could have been indicted for the offense either as principal or accessory. People v. Hrdlicka, 344 Ill 211, 176 NE 308. In the present case it is undisputed that witness McDaniel had no knowledge of the killing of Petermeyer and was not involved in any way in this crime until after Petermeyer's death. On these facts it cannot be concluded that McDaniel is chargeable as a principal in this offense. Ill Rev Stats (1969), c 38, § 5–2(c). An accomplice is said to be one who knowingly, voluntarily and with a common interest with others participates in the commission of a crime either as a principal or as an accessory before the fact. 21 Am Jur 2d, Criminal Law, § 118. Our case law has held that an accessory after the fact is not an accomplice. People v. Sapp, 282 Ill 51. Consequently, it was not improper that an instruction on accomplice testimony was not given.

■■■■ In any event, if such an instruction were appropriate on this issue, the record discloses that defendant failed to submit one. And since the trial court is under no duty to give an instruction on its own motion, the defendant should not now be heard to complain of this error. People v. Caldwell, 39 Ill2d 346, 236 NE2d 706; People v. Marshall, 96 Ill App2d 124, 238 NE2d 182.

■■■■ Coddington finally urges that the trial court committed error in asserting the right against self-incrimination for the witness McDaniel when he did not

371

claim it for himself. During defense counsel's cross-examination of McDaniel as to his prior criminal record, defense counsel asked whether McDaniel had burglarized a particular house. The prosecutor objected and the court sustained the objection, stating that defense counsel may bring out a witness's conviction. Defense counsel argued that it was proper if the witness is willing to testify. The court responded, "I won't let him answer that. That is self-incriminating. Suppose he asked you the same thing." The question was never answered by the witness. Assuming that the trial court's ruling was incorrect, in view of the entire record and particularly prior convictions to which the witness had already testified, we do not feel that the defendant was prejudiced by this ruling. Hence, it would not constitute reversible error. The purpose of review in a criminal case is not to determine whether the record is free from error, but whether a just verdict has been rendered based on evidence establishing defendant's guilt beyond all reasonable doubt after a trial in which no error prejudicial to defendant's rights has occurred. People v. Ward, 32 Ill2d 253, 204 NE2d 741; People v. Hawes, 8 Ill2d 501, 134 NE2d 781; People v. Yarbrough, 97 Ill App2d 457, 240 NE2d 200. We believe that the defendant has had a fair trial and that the jury's verdict was justified by the evidence and was not the result of any prejudicial error.

In view of the foregoing, the judgment of the Circuit Court of St. Clair County is affirmed.

Judgment affirmed.

GOLDENHERSH and EBERSPACHER, JJ., concur.